447 S.E.2d 278

**STATE of West Virginia, Plaintiff Below, Appellee,**

v.

**Robert Earl KIRKLAND, Jr., Defendant Below, Appellant.**

No. 21759.

Supreme Court of Appeals of West Virginia.

Submitted Jan. 19, 1994.

Decided July 15, 1994.

---

**4.** See *Crain I*, 176 W.Va. at 363 n. 17, 342 S.E.2d    at 448 n. 17, as to contempt proceedings.

Stephen R. VanCamp, Asst. Atty. Gen., Charleston, for appellee.

Daynus Jividen, Office of the Public Defender, Charleston, for appellant.

WORKMAN, Justice:

This case is before the Court upon the appeal of Robert Earl Kirkland, Jr., from the October 13, 1992, final order of the Circuit Court of Fayette County sentencing the Appellant to a term of seven to twenty-eight years imprisonment,[1] based upon his January 10, 1992, jury convictions for one count of second degree murder, one count of malicious assault, and one count of attempted murder. The Appellant argues that the following errors were committed by the trial court: 1) the trial court erred in allowing the prosecutor to remove, by means of a peremptory strike, the last remaining member of the Appellant's race from the jury panel after the Appellant made a prima facie case of the prosecutor's purposeful racial discrimination in the selection of the jury and after the prosecutor failed to offer a credible nonracial justification for striking the only remaining member of the Appellant's race from the jury panel; 2) the trial court erred in denying the Appellant's motion for a new trial after the court disqualified the prosecutor from also prosecuting the Appellant's co-defendant's case due to the appearance of impropriety on the part of the prosecutor in his conduct regarding the co-defendant's case; 3) the trial court erred in not granting

the Appellant's motion for a judgment of acquittal because the evidence was insufficient to support the guilty verdict; and 4) the trial court erred in not granting the Appellant's motion for a judgment of acquittal due to the prosecutor's repeated and systematic prosecutorial abuse. Based on a review of the record, the briefs and arguments of the parties,[2] and all other matters submitted before this Court, we agree with the Appellant's contention that insufficient evidence existed to support his convictions and accordingly, we reverse and remand.

I.

On July 6, 1991, Brian Berry pulled into W.D. Tire Sales in Mount Hope, West Virginia, to have the oil checked on his moped, according to the testimony of the tire store owner, Jesse Rhodes. Jesse Rhodes also testified that both Mr. Berry and his stepfather, the Appellant, were regular customers of his business. Jesse Rhodes was assisted in his business by his father, Richard "Dickie" Rhodes. When Mr. Berry pulled into the station, Jesse Rhodes informed Mr. Berry that "Dad has been looking for you. He said he needed to talk to you." At this point, Jesse Rhodes left the premises.

According to the testimony of Ken Suttle, who happened to be at the tire store to pick up an employee, Mr. Berry proceeded into the business where a heated argument ensued between Mr. Berry and Dickie Rhodes regarding the payment of a $103 past due bill. Mr. Suttle testified that he heard Dickie Rhodes tell Mr. Berry that he needed to collect the overdue bill because he had to make payroll. Mr. Suttle stated that Mr. Berry offered Dickie Rhodes three dollars on the bill and that Dickie Rhodes shoved Mr. Berry three or four times. At this point, Mr. Mark Ambler, a customer of the tire store, heard Mr. Berry tell Dickie Rhodes that he was going to get the money owed to the tire

1. The Appellant received consecutive sentences of five to eighteen years for second degree murder, two to ten years for malicious wounding, and one year in the Fayette County Jail for attempted second degree murder.

2. A joint amicus curiae brief was submitted by the West Virginia branches of the NAACP and the Mountain State Bar Association, Inc., and was considered by this Court in rendering its decision.

store. Mr. Ambler testified that Mr. Berry then left the business.

Mr. Berry went to the Stadium Terrace apartments in Mount Hope, where his girlfriend, Tonya Marion, resided. When Mr. Berry arrived at Ms. Marion's apartment, Mary Nichols, who was not only Ms. Marion's mother but also the Appellant's girlfriend, the Appellant, as well as Ms. Marion were present. Ms. Marion testified that Mr. Berry told his stepfather that Dickie Rhodes had "jumped" him, and that the Appellant responded by telling his stepson, "Let's go see what's going on. Let's go talk and see what's go[ing] on." Ms. Nichols testified that neither Mr. Berry nor the Appellant threatened to harm anyone.

Both Mr. Berry and the Appellant left the apartment. Ms. Cynthia Jackson, a resident of Stadium Terrace apartments, who witnessed the two men leaving the apartment, testified that while the Appellant was walking down some steps towards his car, Mr. Berry stopped by an apartment next door and yelled at his friend, William Ullyses Mayo, to join them. Ms. Jackson also testified that Mr. Berry instructed Mr. Mayo "to go back and get his piece." Ms. Marion's testimony indicated that she observed Mr. Mayo leaving his apartment with a gun. There was no evidence that the Appellant knew that Mr. Mayo was either asked by Mr. Berry to retrieve his gun, or had retrieved a gun, as the testimony indicated that by the time Mr. Mayo and Mr. Berry joined the Appellant, the Appellant was already in his car.

Meanwhile, Jesse Rhodes, who had earlier left W.D. Tire Sales, testified that as he was driving back to his business, he went past the Stadium Terrace apartments and observed Mr. Berry and Mr. Mayo getting into the Appellant's car. He also noticed that Mr. Mayo was carrying a gun down beside his leg when he entered the car through the rear door on the driver's side. Concerned about the earlier argument between his father and Mr. Berry, Jesse Rhodes returned to the

business to warn his father about what he had witnessed.

Shortly thereafter, Mr. Berry, Mr. Mayo and the Appellant arrived at the tire store. Jesse Rhodes testified that his father came out of the business with an aluminum baseball bat and "told them the best thing they could do is shut their damn mouths and get back in the car because he didn't want no trouble." Both Mr. Mayo and Mr. Berry returned to the car, while the Appellant went into the business with Dickie Rhodes to discuss the bill. Mr. Harrison Ryder, an employee of W.D. Tire Sales, testified that at first it appeared that Dickie Rhodes suspected that the Appellant had a gun when he observed the Appellant put his hands in his pockets. Mr. Ryder testified that it appeared that Dickie Rhodes, in response to his suspicion, took the ball bat and hit a trash can sitting in the office and then threw the ball bat down. The Appellant immediately took his hands away from his pockets and assured Dickie Rhodes that he did not have a gun. Mr. Ryder testified that he heard the Appellant tell Dickie Rhodes to "[c]hill out[,]" at which point the two began discussing the bill. After a few minutes, Mr. Ryder heard the Appellant assure Dickie Rhodes that "Well, if he won't take care of it, I'll see it's tooken (sic) care of."[3] Several witnesses testified that at this time they thought the argument was resolved and that the Appellant acted as the peacemaker.

The Appellant returned to his car. Dickie Rhodes followed him out into the parking lot. At this point, Mr. Berry who was in the passenger seat of the Appellant's car and Dickie Rhodes got into an argument. Jesse Rhodes testified that Mr. Berry yelled at his father: "I ain't going to pay you, you white son of a bitch." Dickie Rhodes proceeded to the car door, while the Appellant was slowly backing out of the parking lot. Jesse Rhodes testified that his father reached inside the passenger window and hit Mr. Berry. Jesse Rhodes went to get his father, when Mr. Berry pulled out a 9mm pistol[4] and shot

---

3. Jesse Rhodes testified that he heard the Appellant say " 'I'll make sure you get paid, one damn way or another,' or something like that. I [Jesse Rhodes] can't exactly be for sure."

4. Ms. Nichols, the Appellant's girlfriend, testified that she owned the 9mm pistol and had placed it in the glove compartment of the Appellant's car on the evening prior to the shooting. On that evening, the Appellant drove Ms. Nichols, Ms.

Dickie Rhodes in the chest, fatally wounding him. The bullet went through Dickie Rhodes and lodged in Jesse Rhodes' leg. The Appellant immediately drove the threesome away from the crime scene.

Jesse Rhodes testified that he chased the Appellant's car in his pickup truck. When Jesse Rhodes caught up with the Appellant's car, he rammed the car in order to prevent the men from escaping. Several shots were fired by Mr. Berry at Jesse Rhodes' truck, and one of those bullets was later recovered from the radiator of the truck. Jesse Rhodes testified that he ultimately pushed the car into a guard rail near the Mount Hope bypass. Thinking that the car was disabled, he returned to the tire store.

After Jesse Rhodes left, the Appellant, Mr. Berry and Mr. Mayo drove on to a friend's home in Beckley, West Virginia. The Appellant's car was later found abandoned at the Honey in the Rock Motel in Beckley. The Appellant, Mr. Berry and Mr. Mayo voluntarily surrendered to police at the Stadium Terrace apartments the next day.

Additional evidence admitted at trial by the State included the Appellant's exculpatory statement [5] in which the Appellant indicated that after talking to Dickie Rhodes, he thought that "everything was straight[,]" until the argument between Dickie Rhodes and Mr. Berry. The Appellant denied shooting anyone and denied any knowledge that Mr. Berry possessed a gun. The State also submitted a voluntary statement given by Mr. Berry to Corporal James Pack of the Mount Hope Police Department. In the statement, Mr. Berry admitted that he shot Dickie

Rhodes because he felt his life was threatened, but that neither Mr. Mayo nor the Appellant had anything to do with the shooting. Both Mr. Berry and Mr. Mayo were call by the State to testify; however, each witness invoked their Fifth Amendment rights.[6]

The Appellant testified on his own behalf. He stated that on the day of the shooting, Mr. Berry did not appear upset when he told him that he had had an argument with Dickie Rhodes over the unpaid bill and had been "jumped" by Dickie Rhodes. Further, Mr. Berry did not convey to his stepfather that Dickie Rhodes had shoved him. The Appellant testified that while he knew that Mr. Mayo was coming with them to the tire store, he did not know that Mr. Mayo had a gun. The Appellant also testified that when he told Dickie Rhodes that he did not have a gun, he had forgotten about the gun left by Ms. Nichols in the glove compartment of his car. According to the Appellant, he did not realize that a shooting was going to occur until he heard the shot and saw the gun in his stepson's hands. When the shooting occurred, the Appellant panicked and fled the scene. Finally, the Appellant testified that he never intended to kill Dickie Rhodes; that he did not believe that Mr. Berry possessed the intent to kill; and that he did not tell Mr. Berry where the gun was, instruct Mr. Berry to get the gun, or authorize Mr. Berry to use the gun.

## II.

### SUFFICIENCY OF EVIDENCE

We first address the Appellant's contention that the trial court erred in not granting his

---

Marion and Mr. Berry on a double-date to a nightclub in Beckley, West Virginia. When they arrived at the club, Ms. Marion testified that, while all four occupants were in the car, Ms. Nichols left the pistol in the glove compartment to avoid carrying it into the club. Ms. Nichols never retrieved the pistol from the glove compartment.

**5.** The court conducted an in camera hearing and concluded that the statement had been voluntarily given to Martin Burroughs, Mount Hope's Chief of Police. Subsequent to the voluntariness determination, the Appellant's counsel admitted on the record that the statement was exculpatory, and that the Appellant would not be harmed by admitting the statement in evidence.

**6.** It is significant to note that Mr. Mayo, like the Appellant, was also convicted as a principal in the second degree for second degree murder, attempted second degree murder, and unlawful wounding. Mr. Mayo's conviction was overturned by this Court in *State v. Mayo*, 191 W.Va. 79, 443 S.E.2d 236 (1994), because there was insufficient evidence to support his convictions as an aider and abettor, and an unconstitutional jury instruction was given. Mr. Berry, the principal in the first degree, was convicted of first degree murder with mercy. Finally, Mr. Mayo was permitted to invoke his Fifth Amendment right because he was awaiting the appeal of his conviction. Mr. Berry's trial occurred after the Appellant's.

motion for a judgment of acquittal based on insufficient evidence to support the guilty verdict. The Appellant argues that the facts failed to show any unified and single purpose among the co-defendants; any encouragement or aid given by the Appellant to the alleged principal, Mr. Berry; or any complicity on the part of the Appellant. The Appellee argues that when viewed in a light most favorable to the State, the evidence was sufficient to support the Appellant's convictions.

The standard of review on appeal for determining whether sufficient evidence was presented at trial to warrant upholding a conviction is:

'In a criminal case, a verdict of guilt will not be set aside on the ground that it is contrary to the evidence, where the state's evidence is sufficient to convince impartial minds of the guilt of the defendant beyond a reasonable doubt. The evidence is to be viewed in the light most favorable to the prosecution. To warrant interference with a verdict of guilt on the ground of insufficiency of evidence, the court must be convinced that the evidence was manifestly inadequate and that consequent injustice has been done.' Syl. Pt. 1, State v. Starkey, 161 W.Va. 517, 244 S.E.2d 219 (1978).

Syl. Pt. 7, State v. Knotts, 187 W.Va. 795, 421 S.E.2d 917 (1992). Further, in syllabus point 8 of State v. Fortner, 182 W.Va. 345, 387 S.E.2d 812 (1989) we held that

[w]here a defendant is convicted of a particular substantive offense, the test of the sufficiency of the evidence to support the conviction necessarily involves consideration of the traditional distinctions between parties to offenses. Thus, a person may be convicted of a crime so long as the evidence demonstrates that he acted as an accessory before the fact, as a principal in the second degree, or as a principal in the first degree in the commission of such offense.

Consequently, before applying the review standard to the present case, it is necessary to examine the legal requirements necessary for a conviction as an aider and abettor to a crime, so that a determination can be made as to whether the facts in the present case demonstrate that the Appellant acted accord-

ingly. In Fortner, we examined the law concerning aiding and abetting and stated that

[t]o be convicted as an aider and abettor, the law requires that the accused 'in some sort associate himself with the venture, that he participate in it as in something that he wishes to bring about, that he seek by his action to make it succeed.' United States v. Peoni, 100 F.2d 401, 402 (2d Cir.1938), quoted with approval in Nye & Nissen v. United States, 336 U.S. 613, 619, 69 S.Ct. 766, 770, 93 L.Ed. 919, 925 (1949), and State v. Harper, [179] W.Va. [24], [28], 365 S.E.2d 69, 73 (1987). The State must demonstrate that the defendant 'shared the criminal intent of the principal in the first degree.' State v. Harper, [179] W.Va. at [29], 365 S.E.2d at 74. (Citations omitted). In this regard, the accused is not required to have intended the particular crime committed by the perpetrator, but only to have knowingly intended to assist, encourage, or facilitate the design of the criminal actor. The intent requirement is relaxed somewhat where the defendant's physical participation in the criminal undertaking is substantial.

Id. at 356, 387 S.E.2d at 823. (some citations omitted).

We also reiterated the established principle that "mere presence at the scene of the crime, even with knowledge of the criminal purpose of the principal in the first degree, is not, alone, sufficient to make the accused guilty as a principal in the second degree." Id. Accordingly, we concluded in syllabus points 9 and 10 of Fortner, that:

" 'Merely witnessing a crime, without intervention, does not make a person a party to its commission unless his interference was a duty, and his non-interference was one of the conditions of the commission of the crime; or unless his non-interference was designed by him and operated as an encouragement to or protection of the perpetrator.' Syllabus, State v. Patterson, 109 W.Va. 588, [155 S.E. 661] [ (1930) ]." Syllabus Point 3, State v. Haines, 156 W.Va. 281, 192 S.E.2d 879 (1972).

Proof that the defendant was present at the time and place the crime was committed is a factor to be considered by the jury in determining guilt, along with other circumstances, such as the defendant's association with or relation to the perpetrator and his conduct before and after the commission of the crime.

182 W.Va. at 349, 387 S.E.2d at 816.

■ Keeping in mind the legal requirements of aiding and abetting, we now test the sufficiency of the evidence to support the Appellant's criminal convictions. First, there was no evidence which indicated that the Appellant willingly participated in the criminal venture with the perpetrator, Mr. Berry. The evidence indicated that after the Appellant was informed by his stepson that Dickie Rhodes was upset over an unpaid bill and had accosted his stepson, the Appellant accompanied his stepson and his stepson's friend, Mr. Mayo, to the tire store to resolve the dispute. There was absolutely no evidence that the Appellant went to the tire store with the other two men after devising a plan to get revenge with Dickie Rhodes. While Mr. Mayo retrieved a gun prior to accompanying the Appellant and Mr. Berry to the tire store, there was no evidence that the Appellant knew that Mr. Mayo possessed the weapon or that Mr. Berry requested that Mr. Mayo bring his weapon. Likewise, there was no evidence, other than the Appellant's knowledge that a 9mm pistol was in the glove compartment, that the Appellant knew that Mr. Berry removed the pistol from the glove compartment of the Appellant's car prior to the shooting.

Further, the State failed to establish that the Appellant possessed the same criminal intent as that of the principal in the first degree. The evidence did not demonstrate that the Appellant encouraged, assisted or facilitated the shooting committed by Mr. Berry. To the contrary, the evidence established that the Appellant attempted to act as a peacemaker; that during his discussion with Dickie Rhodes, the Appellant asked him to "chill out;" and that by the conclusion of their discussion, witnesses testified that the matter appeared to be resolved. It is undis-

puted that it was Mr. Berry who fatally shot Dickie Rhodes and wounded Jesse Rhodes. Up until that moment, the situation had been peacefully handled by the Appellant. The only questionable conduct on the Appellant's part was that he was driving the car which fled the scene after Mr. Berry shot his victims, and that the Appellant was driving the car when Mr. Berry continued shooting at Jesse Rhodes' truck as Mr. Rhodes chased the threesome. Again, however, there was no evidence offered that the Appellant had prior knowledge of Mr. Berry's plan, or that the Appellant encouraged or incited Mr. Berry's continuing conduct. Consequently, due to the lack of evidence by the State that the shooting was the result of concerted criminal plan or venture which included the Appellant, we simply cannot attribute Mr. Berry's unanticipated actions as a principal in the first degree to the Appellant.

■ Upon viewing the evidence in the light most favorable to the prosecution, as we are required to do, we still conclude that the evidence was insufficient to prove the Appellant guilty of the crimes charged beyond a reasonable doubt. *See State v. Mayo*, 191 W.Va. 79, 443 S.E.2d 236 (1994) (finding insufficient evidence to support conviction of second degree murder and unlawful wounding of Appellant's co-defendant). Having concluded that the Appellant's convictions at his first trial were based upon insufficient evidence, "[t]he Double Jeopardy Clause of the Federal and this State's Constitutions forbids a second trial for the purpose of affording the prosecution another opportunity to supply evidence which it failed to muster in the first proceeding." Syl. Pt. 4, *State v. Frazier*, 162 W.Va. 602, 252 S.E.2d 39 (1979). Therefore, the State is prohibited from retrying the Appellant for aiding and abetting the murder of Dickie Rhodes and for attempted murder and malicious wounding of Jesse Rhodes.

### III.

### PEREMPTORY STRIKE

The only other issue we address [7] is whether the trial court erred in allowing the State

---

7. Due to the reversal and double jeopardy bar to

re-trial, and based upon a review of the record,

to use a peremptory strike to remove the last member of the Appellant's race from the jury panel. The Appellant argues that he made a prima facie case of racial discrimination on the part of the prosecutor in selecting the jury, and that the trial court erred in finding that the prosecutor offered a credible non-racial justification for striking the only remaining member of the Appellant's race from the jury panel. *See State v. Marrs*, 180 W.Va. 693, 379 S.E.2d 497 (1989). The Appellant also contends that the trial court should have conducted a full and complete evidentiary hearing on the reliability and relevance of the hearsay evidence used by the prosecutor to rebut the prima facie case of racial discrimination before it determined whether the prosecutor's peremptory strike was indeed racially neutral. In contrast, the Appellee maintains that the trial court was not clearly erroneous in finding that the prosecutor set forth credible non-racial reasons for exercising the peremptory challenge.

According to the record, twenty people were selected from the venire to form the jury panel from which the Appellant's jury would be selected. Four additional people, including Mr. John Lewis, a black man, were selected for an alternate jury pool. A number of potential jurors were struck for cause from the jury panel, and it became necessary to move a person from the alternate pool to the jury panel. The Appellant suggested moving Mr. Lewis.[8] The prosecutor stated that he "ha[d] no problem with that." During voir dire, Mr. Lewis acknowledged that he knew one of the witnesses for the State, Mary Nichols, who was also the Appellant's girlfriend and a known drug trafficker in the Beckley area. Mr. Lewis also stated that he

was familiar with firearms and had no problem with people carrying them.

Because of these two responses, the prosecutor decided to conduct further inquiry into the background of Mr. Lewis. Before exercising any peremptory strikes, the prosecutor attempted to contact Flossie Lewis, whom he thought might be related to the juror. Unable to reach Ms. Lewis, the prosecutor contacted one of Ms. Lewis' neighbors, as well as a confidential informant and a deputy sheriff. The prosecutor obtained the following information from these individuals about Mr. Lewis: 1) he went by the nickname "Snake Lewis;" 2) he was known to be a skirmisher and brawler; and 3) he had a DUI conviction.[9] As a result of this information and the information obtained during voir dire, the prosecutor used a peremptory strike to exclude Mr. Lewis from the jury panel.

Based upon the Appellant's objection to the prosecutor's use of a peremptory challenge to strike Mr. Lewis, the trial court found that the Appellant established a prima facie case that the prosecutor utilized a peremptory challenge on the basis of race. However, the trial court further concluded that the prosecutor rebutted that prima facie case by advancing racially neutral reasons for excluding Mr. Lewis. The Appellant's attorney argued that the trial court should conduct an evidentiary hearing on the reliability of the State's information cited in support of the racially neutral reasons. The trial court denied the Appellant's request, stating that:

we conclude that the remaining assignments of error raised by the Appellant are without merit and we decline to address them. Those assignments of error concerned the trial court's denial of the Appellant's motion for a new trial based upon the Appellant's assertion that the prosecutor should have been disqualified, the alleged prosecutorial abuse over statements made by the prosecutor during closing argument, and the prosecutor's failure to provide, during discovery, evidence of the blood type of stains on the car seat which the Appellant argues was exculpatory in nature.

8. Specifically, there was a discussion between the State, the Appellant and the trial court as to

whether to select a juror from the alternate pool by lot, or by letting the Appellant pick. The Appellant's counsel then suggested to the court to "[j]ust move everybody up a chair[,]" and the State agreed to this. Mr. Lewis was the next in order following the Appellant's counsel's suggestion. West Virginia Rule of Criminal Procedure 24(c), which governs the selection of alternate jurors, provides that "[a]lternate jurors in the order in which they are called shall replace jurors...."

9. The voir dire of the jury did not include the question of whether any of the jurors had ever been convicted of a crime.

I was trying to think of what utility a hearing would have in this matter. The information gleaned by the prosecutor over the telephone is offered to explain the prosecutor's reasoning in making the peremptory strike. Actually, the truth of the information which he received is not directly relevant. The relevant question is whether or not he did get the information, and whether or not he did believe it, and whether or not it was on that basis and other bases, excluding racial bases, upon which he made his decision. This case has to do with the believability of the prosecuting attorney's statement.

I would assume that the credibility of the prosecuting attorney as an officer of the Court would be relevant, and I certainly have the highest regard for Mr. Billings' credibility, and I certainly think that his— the way he approached this thing is not atypical of the way he goes about his business, and it would seem to me that the representations that he has made certainly meets any requirement or any burden that has shifted upon him due to the fact that the panelist in question was a black man and the defendant's a black man and that the challenge was made; that the explanation that the prosecutor has made, which is believable, would certainly meet the burden of proof of showing that the peremptory challenge was made on the basis other than race. I, therefore, don't believe an evidentiary hearing is necessary.

█ This Court examined whether a prosecutor's use of a peremptory challenge against the only remaining black prospective juror was a violation of equal protection in *Marrs.* *See* 180 W.Va. at 693, 379 S.E.2d at 497; *see also State v. Bass,* 189 W.Va. 416, 432 S.E.2d 86 (1993). Consistent with the United States Supreme Court's ruling in *Batson v. Kentucky,* 476 U.S. 79, 106 S.Ct. 1712, 90 L.Ed.2d 69 (1986), we held in *Marrs* that "[i]t is a violation of the Equal Protection Clause of the Fourteenth Amendment to the U.S. *Constitution* for a member of a cognizable racial group to be tried on criminal charges by a jury from which members of his race have been purposely excluded." Syl. Pt. 1, 180 W.Va. at 693, 379 S.E.2d at 497.

█ In *Marrs,* we also adopted the standard established by the United States Supreme Court in *Batson* for proving a violation of equal protection in the use of peremptory challenges:

To establish a prima facie case for a violation of equal protection due to racial discrimination in the use of peremptory jury challenges by the State, 'the defendant first must show that he is a member of a cognizable racial group, and that the prosecutor has exercised peremptory challenges to remove from the venire members of the defendant's race. Second, the defendant is entitled to rely on the fact, as to which there can be no dispute, that peremptory challenges constitute a jury selection practice that permits "those to discriminate who are of a mind to discriminate." Finally, the defendant must show that these facts and any other relevant circumstances raise an inference that the prosecutor used that practice to exclude the veniremen from the petit jury on account of their race.' [Citations omitted.]

Syl. Pt. 2, *Marrs,* 180 W.Va. at 693–94, 379 S.E.2d at 497–98 (quoting *Batson,* 476 U.S. at 96, 106 S.Ct. at 1723). Once a defendant establishes this prima facie case, "[t]he State may defeat a defendant's prima facie case of a violation of equal protection due to racial discrimination in selection of a jury by providing non-racial, credible reasons for using its peremptory challenges to strike members of the defendant's race from the jury." Syl. Pt. 3, *Marrs,* 180 W.Va. at 694, 379 S.E.2d at 498. Next, as the United States Supreme Court explained, "[t]he trial court then [has] ... the duty to determine if the defendant has established purposeful discrimination." *Batson,* 476 U.S. at 98, 106 S.Ct. at 1724.

Subsequently, in *Hernandez v. New York,* 500 U.S. 352, 111 S.Ct. 1859, 114 L.Ed.2d 395 (1991), the United States Supreme Court elaborated on the second and third prongs of the standard enunciated in *Batson.* With regard to the race-neutral explanation for the peremptory strike given by the prosecutor, the Supreme Court opined that

[a] neutral explanation in the context of our analysis here means an explanation based on something other than the race of

the juror. At this step of the inquiry, the issue is the facial validity of the prosecutor's explanation. Unless a discriminatory intent is inherent in the prosecutor's explanation, the reason offered will be deemed race neutral.

*Id.* at 360, 111 S.Ct. at 1866, 114 L.Ed.2d at 406. The Supreme Court also reiterated the weight which should be afforded to the trial court's findings and determinations as to whether purposeful discrimination was established:

> In *Batson*, we explained that the trial court's decision on the ultimate question of discriminatory intent represents a finding of fact of the sort accorded great deference on appeal....
>
> Deference to trial court findings on the issue of discriminatory intent makes particular sense in this context because, as we noted in *Batson*, the finding will 'largely turn on evaluation of credibility.'

*Id.* at 364, 111 S.Ct. at 1868–69, 114 L.Ed.2d at 408–09 (quoting *Batson*, in part, 476 U.S. at 98 n. 21, 106 S.Ct. at 1724 n. 21).

■ We conclude that the trial court was not erroneous in its determination that the prosecutor offered credible, racially neutral reasons for using a peremptory challenge to strike Mr. Lewis, since none of the numerous reasons offered by the prosecutor were in any way related to the juror's race. The trial court's findings regarding the reasons propounded by the State depended upon the trial court's evaluation of the State's credibility. In this case, the trial court specifically found the prosecutor credible and his explanation believable. Accordingly, the trial court's findings are afforded the deference they deserve. Similarly, in *Bass*, we upheld the trial court's finding that the prosecutor offered racially neutral reasons for striking the last black person from the defendant's jury. 189 W.Va. at 421–22, 432 S.E.2d at 91. In *Bass*, the State's reasons for striking the juror were that the juror had attended two political rallies on behalf of the defendant and that the juror's wife had notarized an ethics complaint that an organization, for whom she worked, had filed against the prosecutor. *Id.*

Finally, we address the Appellant's argument that the trial court's determination of whether the State's reasons were racially neutral should not have been made without the benefit of an evidentiary hearing. In *Batson*, the United States Supreme Court specifically left unaddressed the methods to be utilized by trial courts in making this determination, stating that "[i]n light of the variety of jury selection practices followed in our state and federal trial courts, we make no attempt to instruct these courts how best to implement our holding today." 476 U.S. at 99–100 n. 24, 106 S.Ct. at 1725 n. 24.

Subsequently, the Fourth Circuit Court of Appeals, in addressing whether the *Batson* inquiry requires an evidentiary hearing, stated that "[t]here is no absolute right to an evidentiary hearing." *United States v. Tindle*, 860 F.2d 125, 130 (4th Cir.1988). The Fourth Circuit further stated that

> We have held that the conducting of an evidentiary hearing is within the sound discretion of the district court. In *United States v. Garrison*, 849 F.2d 103 (4th Cir. 1988) we stated:
>
> > Garrison's insistence on an evidentiary hearing in which prosecutors and defense attorneys and possibly other witnesses would be examined and cross-examined misconceives the *Batson* inquiry. Although a district court could conduct such a hearing if it believed circumstances warranted it, *Batson* does not require this intrusion on the trial proceedings. When, as here, the defendant made out a *prima facie* case of a [sic] discrimination, *Batson* requires the prosecutor to "articulate a neutral explanation related to the particular case...." 476 U.S. at 98 [106 S.Ct. at 1723]. The explanation given by the prosecutor satisfied *Batson's* requirement for neutrality. The prosecutor is justified in striking jurors that he or she perceives to be inattentive or uninterested. If the trial court believes the prosecutor's explanation, a reviewing court ordinarily should give this credibility finding "great deference." 476 U.S. at 98 n. 21 [106 S.Ct. at 1724 n. 21].

860 F.2d at 130 (quoting *Garrison,* 849 F.2d at 106); *see also Commonwealth v. Snodgrass,* 831 S.W.2d 176, 179 (Ky.1992) ("The trial court may accept at face value the explanation given by the prosecutor depending upon the demeanor and credibility of the prosecutor.... No additional inquiry or evidentiary hearing is required under *Batson.*").

Following the precedent established by the Fourth Circuit in *Tindle* and *Garrison,* we hold that a trial court should conduct an evidentiary hearing if, after considering the prosecutor's representations regarding the reasons for using a peremptory strike to exclude the only remaining black juror, the court deems that the circumstances surrounding the prosecutor's representations warrant such a hearing to determine whether the explanations offered by the prosecutor in exercising said strike were racially neutral or discriminatory in nature. The determination on whether to conduct an evidentiary hearing is within the sound discretion of the trial court.

In the present case, the Appellant's attorney advocated that an evidentiary hearing be conducted to ascertain the truth of the hearsay information utilized by the prosecutor in exercising the peremptory strike. However, the Appellant, other than wanting to question the individuals who provided the prosecutor with the information, did not advance any representations that the prosecutor was motivated by racial discrimination. Consequently, the trial court properly denied the Appellant's request for an evidentiary hearing.

Based on the foregoing, the decision of the Circuit Court of Fayette County is affirmed in part, and reversed and remanded in part for further proceedings consistent with this opinion.

Affirmed, in part; Reversed and remanded, in part.