456 S.E.2d 22

**STATE of West Virginia, Plaintiff Below, Appellee,**

v.

**Matthew Darin DEEM, Defendant Below, Appellant.**

No. 22488.

Supreme Court of Appeals of West Virginia.

Submitted Jan. 11, 1995.

Decided Feb. 17, 1995.

---

Martha E. Barber, Asst. Atty. Gen., Charleston, for appellee.

William E. Kiger, Parkersburg, for appellant.

PER CURIAM:

This case is before the Court on an appeal from the January 28, 1994, sentencing order of the Circuit Court of Wood County, sentencing the Appellant, Matthew Deem, to one year in the Wood County Correctional Center for his jury conviction of aiding and abetting an unlawful assault.[1] The Appellant argues that the jury's verdict was not supported by the evidence and that the lower court erred in denying the Appellant's motions for judgment of acquittal, and for a new trial. Based upon a review of the record, the parties' arguments, and all other matters submitted before this Court, we conclude that no error was committed by the lower court and accordingly, we affirm.

## I.

On June 27, 1993, the Appellant, Kenny Tullius, Dennis Hoosier and Gary Taylor left a party in Mr. Tullius' car for the purpose of taking Mr. Taylor home. Mr. Taylor lived near the intersection of Eighth Avenue and Elder Street in Parkersburg, West Virginia. Howard Curran, the victim, testified that as Mr. Tullius' car approached this intersection, he and a group of people were standing in front of David Burke's house.[2] According to the victim, someone in his group made the remark "[d]o you remember me?" to Mr. Tullius as Mr. Tullius' car passed by the group. Mr. Taylor, who was a passenger in Mr. Tullius' car, testified that the remark he heard yelled at Mr. Tullius was "[s]low down, nigger."

In response to the remark, Mr. Tullius pulled his car over to the curb. Mr. Taylor's testimony indicated that Mr. Tullius originally started to pull over in front of Mr. Taylor's house, but that he told Mr. Tullius to "go on up the road, 'cause I don't need the trouble." The Appellant, Mr. Hoosier, Mr. Tullius, and Mr. Taylor exited the Tullius vehicle. At that time, these individuals, with the exception of Mr. Taylor,[3] were joined by Ben Gard and Robbie Cottrill, who both exited a vehicle driven by Mr. Gard. All of these individuals retrieved clubs[4] from Mr. Tullius' car, according to Mr. Charles Arnold, who lived in the neighborhood and was participating in a neighborhood watch at the time of the incident. Sandra Lynch, also a neighbor, testified that as the group took clubs from the vehicle she "heard them say, '[i]f you want to rumble, let's do it.' "

---

1. It is important to note that Benjamin Gard, Mr. Hoosier and Mr. Tullius were indicted along with the Appellant for malicious assault. Mr. Cottrill apparently was a juvenile and was not included in the indictment.

2. Mr. Curran testified that he, as well as the other individuals with him, had just finished watching a televised boxing match at Mr. Burke's house when they decided to go outside for some fresh air.

3. Mr. Taylor departed from the group and returned to his home from where he viewed the altercation which resulted in the Appellant's conviction.

4. According to the testimony, the clubs appeared to be either axe handles or tomato stakes.

The Appellant's group [5] then walked with their clubs towards the victim and his group. According to both the Appellant's and Mr. Taylor's testimony, the Appellant briefly left his group to get a cigarette from Mr. Taylor who was on his front porch, but the Appellant returned to his group prior to the assault. The victim testified that Mr. Hoosier came to within three feet of him, that Mr. Tullius was behind Mr. Hoosier and that the rest of the Appellant's group, including the Appellant, branched out, in a semicircular fashion, approximately twenty feet behind Mr. Hoosier and Mr. Tullius. Mr. Arnold testified that the Appellant, Mr. Gard and Mr. Cottrill had their clubs down at their sides. The victim testified that he was arguing with Mr. Hoosier and Mr. Tullius, and that prior to Mr. Hoosier striking him, Mr. Hoosier instructed the Appellant's group that "he [Mr. Hoosier] wanted this guy [the victim] and not to touch this guy [a man identified as Mark Griffith and his girlfriend] and things like that." Shortly thereafter, Mr. Hoosier suddenly and without any aggression displayed by the victim, struck the victim with the club. The victim sustain a laceration requiring ten stitches and a slight concussion.

According to the undisputed testimony, the Appellant and the victim never exchanged words. Further, the Appellant never said anything to Mr. Hoosier prior to Mr. Hoosier striking the victim. The victim also testified that he did not know the Appellant and that he had never had a problem with him.

After Mr. Hoosier struck the victim, Mr. Taylor testified that "[t]hey took off running up the road and said, 'Let's get out of here before the cops get here.'" Ms. Lynch also testified that she heard statements from Mr. Tullius and Mr. Hoosier as they were leaving the crime scene to the effect of "[t]hat was fun" and "[w]e ought to do this more often[,]" and that all the members of the Appellant's group appeared to be laughing.

The Appellant [6] testified on his own behalf. He stated that as they were driving around the corner at the intersection of Eighth Avenue and Elder Street someone yelled at the Tullius vehicle, causing Mr. Tullius to pull over to the curb. The Appellant testified that he grabbed a club from Mr. Tullius' car "for self defense because I saw the two golf clubs [7] and I needed it in case anything would happen." The Appellant further stated that "I had a feeling that something would happen, but I didn't think it would go like—get this drastic." Finally, the Appellant's testimony indicated that he originally denied having the club to the police because he believed he was just a witness and that he was making a statement just to inform the police about what transpired that night.

## II.

■ The only issue before the Court is whether sufficient evidence was presented to the jury to support the Appellant's conviction. The Appellant asserts that the State's theory of the case was that the Appellant, simply by being in the vicinity of the assault, gave "moral support" to the principal in the first degree which warranted the Appellant's conviction for aiding and abetting the unlawful assault. The Appellant argues that this Court has never recognized "moral support" alone as being a basis for convicting a person of aiding and abetting. In contrast, the Appellee contends that when viewed in a light most favorable to the State, the evidence was sufficient to support the Appellant's conviction for aiding and abetting the unlawful assault.

■ The standard of review on appeal for determining whether sufficient evidence

---

5. For purposes of factual recitation, the Appellant's group refers only to the individuals with whom the Appellant had associated himself prior to the assault, including Mr. Hoosier, Mr. Tullius, Ben Gard and Robbie Cottrill. There is no intended implication that the Appellant in any way created the group for the purposes of the assault.

6. According to the testimony of Captain Ronald L. Brannon, a police officer with the City of

Parkersburg, the Appellant had no prior criminal record.

7. A defense witness, Stephen Wells, who was participating in a neighborhood watch group and observed the assault, corroborated the Appellant's testimony that golf clubs were present in the victim's group prior to the assault. However, Mr. Wells also testified that he did not see any golf clubs at the time the assault took place.

was admitted at trial to support a conviction is:

> In a criminal case, a verdict of guilt will not be set aside on the ground that it is contrary to the evidence, where the state's evidence is sufficient to convince impartial minds of the guilt of the defendant beyond a reasonable doubt. The evidence is to be viewed in the light most favorable to the prosecution. To warrant interference with a verdict of guilt on the ground of insufficiency of evidence, the court must be convinced that the evidence was manifestly inadequate and that consequent injustice has been done.

Syl. Pt. 1, *State v. Starkey*, 161 W.Va. 517, 244 S.E.2d 219 (1978); *see* Syl. Pt. 1, *State v. Kirkland*, 191 W.Va. 586, 447 S.E.2d 278 (1994). Further, in syllabus point 8 of *State v. Fortner*, 182 W.Va. 345, 387 S.E.2d 812 (1989) we held that

> [w]here a defendant is convicted of a particular substantive offense, the test of the sufficiency of the evidence to support the conviction necessarily involves consideration of the traditional distinctions between parties to offenses. Thus, a person may be convicted of a crime so long as the evidence demonstrates that he acted as an accessory before the fact, as a principal in the second degree, or as a principal in the first degree in the commission of such offense.

Consequently, before a determination can be made of whether sufficient evidence exists to support the Appellant's conviction, it is necessary to examine the legal requirements for an aiding and abetting conviction. We recently reviewed these requirements in *Kirkland*, and the Appellant correctly indicates that *Kirkland*, as well as the related case of *State v. Mayo*, 191 W.Va. 79, 443 S.E.2d 236 (1994),[8] are dispositive of the issue currently before the Court. *See Kirkland*, 191 W.Va. at 586, 447 S.E.2d at 278. In *Kirkland*, we stated that:

> '[t]o be convicted as an aider and abettor, the law requires that the accused "in some sort associate himself with the venture, that he participate in it as in some-

thing that he wishes to bring about, that he seek by his action to make it succeed." *United States v. Peoni*, 100 F.2d 401, 402 (2d Cir.1938), *quoted with approval* in *Nye & Nissen v. United States*, 336 U.S. 613, 619, 69 S.Ct. 766, 770, 93 L.Ed. 919, 925 (1949), and *State v. Harper*, [179] W.Va. [24], [28], 365 S.E.2d 69, 73 (1987). The State must demonstrate that the defendant "shared the criminal intent of the principal in the first degree." *State v. Harper*, [179] W.Va. at [29], 365 S.E.2d at 74. (Citations omitted). In this regard, the accused is not required to have intended the particular crime committed by the perpetrator, but only to have knowingly intended to assist, encourage, or facilitate the design of the criminal actor. The intent requirement is relaxed somewhat where the defendant's physical participation in the criminal undertaking is substantial.'

191 W.Va. at 592, 447 S.E.2d at 284 (quoting *Fortner*, 182 W.Va. at 356, 387 S.E.2d at 823); *see Mayo*, 191 W.Va. at 82, 443 S.E.2d at 239.

We also restated the established principle that:

> " ' "Merely witnessing a crime, without intervention, does not make a person a party to its commission unless his interference was a duty, and his non-interference was one of the conditions of the commission of the crime; or unless his non-interference was designed by him and operated as an encouragement to or protection of the perpetrator." Syllabus, *State v. Patterson*, 109 W.Va. 588, [155 S.E. 661] [1930].' Syllabus Point 3, *State v. Haines*, 156 W.Va. 281, 192 S.E.2d 879 (1972)."

Syl. Pt. 3, *Kirkland*, 191 W.Va. at 588, 447 S.E.2d at 280 (quoting Syl. Pt. 9, *Fortner*, 182 W.Va. at 345, 387 S.E.2d at 812); *see* Syl. Pt. 1, *Mayo*, 191 W.Va. at 80, 443 S.E.2d at 237; Syl. Pt. 2, *State v. Hoselton*, 179 W.Va. 645, 371 S.E.2d 366 (1988). However, we cautioned that

> '[p]roof that the defendant was present at the time and place the crime was committed is a factor to be considered by the

---

**8.** The Appellants in *Kirkland* and *Mayo* were co-defendants. Consequently, both cases involve the same factual pattern and a similar application of the law of aiding and abetting.

jury in determining guilt, along with other circumstances, such as the defendant's association with or relation to the perpetrator and his conduct before and after the commission of the crime.' 191 W.Va. at 588, 447 S.E.2d at 280, Syl. Pt. 4 (quoting Syl. Pt. 10, *Fortner*, 182 W.Va. at 345, 387 S.E.2d at 812). Further, "[a]n act of relatively slight importance may render the defendant criminally liable as a participant in the offense." *Fortner*, 182 W.Va. at 357, 387 S.E.2d at 823.

With these legal requirements in mind, we test the sufficiency of the evidence used to convict the Appellant for aiding and abetting an unlawful assault. First, the Appellant associated himself with the criminal venture perpetrated by Mr. Hoosier in a manner which could be interpreted by a jury as indicating that the Appellant also sought the assault to occur. *See Kirkland*, 191 W.Va. at 592, 447 S.E.2d at 284. Both the Appellant and Gary Taylor testified that, prior to the assault, they felt that some kind of trouble was going to occur after a member of the victim's group yelled at Mr. Tullius, but the Appellant testified that he did not think it would be that "drastic." Then, once the Tullius car pulled over, the Appellant exited the car along with Mr. Hoosier and retrieved a club from the Tullius vehicle. After acquiring the clubs, remarks were made by members of the Appellant's group to the effect that if the victim's group wanted to "rumble," then "let's do it," which confirmed the Appellant's feeling that some sort of confrontation between the two groups was going to occur. The Appellant, with his club in hand, proceeded to stand in a semicircle behind Mr. Hoosier during the time when Mr. Hoosier assaulted the victim. While there is no evidence that the Appellant ever actually spoke to either the victim or the assailant, there was evidence that he shared in Mr. Hoosier's criminal intent by supporting, encouraging and facilitating Mr. Hoosier's assault on the victim. This evidence not only demonstrates that the Appellant lent his moral support to the perpetrator, but that he went further than just lending moral support when he took the affirmative action of carrying the club. This affirmative conduct made it easier for Mr. Hoosier to assault the victim, even though the Appellant may not have intended the assault to occur. Finally, as they fled the scene, the Appellant's group was observed laughing over the events which had transpired. These facts do not describe a spectator or a mere witness who was detached and disassociated from the principal.

Finally, we are unpersuaded by the Appellant's assertion that the facts of this case are analogous to the facts of *Hoselton* and, therefore, should be resolved in the same manner. *See* 179 W.Va. 645, 371 S.E.2d 366. In *Hoselton*, the defendant was convicted of entering without breaking a vessel, with intent to commit larceny. *Id.* at 646, 371 S.E.2d at 367. The defendant was with several friends when they went onto a docked barge. While the defendant was standing at one end of the barge, his friends broke into a storage unit. The defendant was unaware of his friends' intention until he walked over to the unit and observed them handling items from the unit. The defendant left the barge and returned to an automobile owned by one of his friends who remained on the barge at the storage unit. His friends eventually returned to the automobile with stolen goods. The defendant did not aid his friends in placing the items in the automobile. The defendant was driven home. None of the items or profits from the resale of the items were given to the defendant. *Id.* at 646–47, 371 S.E.2d at 367–68.

The defendant in *Hoselton* was convicted under a theory that he aided and abetted the crime by acting as a lookout. *Id.* at 648, 371 S.E.2d at 369. The only evidence suggesting that the defendant was a lookout was his response to an investigating officer's questioning about whether the defendant was acting as a lookout, to which the defendant responded: "You could say that. I just didn't want to go down there." *Id.* at 649, 371 S.E.2d at 370. We reversed the defendant's conviction, finding that the defendant was only a witness to the crime since the state failed to prove that he participated in and shared in the same criminal intent to commit larceny as the actual perpetrators. *Id.*

In contrast, in the present case the State presented evidence that the Appellant admittedly knew that trouble was likely to occur.

Rather than disassociating himself from the group as the defendant did in *Hoselton,* the Appellant chose to participate with the group in the ensuing confrontation which resulted in the assault of Mr. Curran. *See* 179 W.Va. at 645, 371 S.E.2d at 366.

Accordingly, upon viewing the evidence in the light most favorable to the prosecution, we conclude that the Appellant was not a mere witness to the assault, because his non-interference was designed and operated not only to encourage the assault perpetrated by Mr. Hoosier but to protect that conduct as well. *See* Syl. Pt. 3, *Kirkland,* 191 W.Va. at 588, 447 S.E.2d at 280. Accordingly, we affirm the decision of the lower court.

Affirmed.

BROTHERTON, J., did not participate.

FOX, Judge, sitting by temporary assignment.

CLECKLEY, J., dissents, and reserves the right to file a dissenting opinion.

CLECKLEY, Justice, dissenting:

For the reasons stated in my concurring opinion in *State v. Phalen,* 192 W.Va. 267, 271–72, 452 S.E.2d 70, 74–75 (1994), I respectfully dissent from the legal standard expressed in Syllabus Point 1 of the majority's opinion.