**UNITED STATES of America, Appellee,**

v.

**Antonio Duran SALAZAR,
Defendant–Appellant.**

**No. 1036, Docket 90–1543.**

United States Court of Appeals,
Second Circuit.

Argued March 27, 1991.

Decided Sept. 18, 1991.

Richard B. Lind, New York City, for defendant-appellant.

Dietrich L. Snell, Asst. U.S. Atty., New York City, (Otto G. Obermaier, U.S. Atty. for the S.D. New York, David E. Brodsky, on the brief), for appellee.

Before OAKES, Chief Judge, and TIMBERS and KEARSE, Circuit Judges.

KEARSE, Circuit Judge:

Defendant Antonio Duran Salazar appeals from a final judgment of conviction entered in the United States District Court for the Southern District of New York, Michael B. Mukasey, *Judge*, following his conditional plea of guilty to one count of possession, with intent to distribute, of five or more grams of "crack" cocaine within 1,000 feet of a school, in violation of 21 U.S.C. §§ 812, 841(a)(1), 841(b)(1)(B), and 845a(a) (1988). Salazar was sentenced principally to 63 months' imprisonment, to be followed by four years' supervised release. On appeal, he contends that the district court should have granted his motion to suppress the narcotics seized from him on the basis that (1) the officers who frisked him did not have sufficient grounds for a *Terry* stop, *see Terry v. Ohio*, 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968), and (2) even if the stop was valid, the ensuing search was improper. For the reasons below, we disagree and affirm the judgment of conviction.

## I. BACKGROUND

The events leading to Salazar's arrest were described at a suppression hearing by Drug Enforcement Administration ("DEA") special agent Jeffrey DeHart. DeHart testified that on November 29, 1989, during a drug investigation in the 300 block of West 93rd Street in Manhattan, he and four other agents were informed, by a person who had not previously been an informant, that Apartment 226 at 312 West 93rd Street was being used in connection with sales of crack. The informant stated that "a short, dark Hispanic male ... would come and go from that apartment and was selling crack cocaine from there and on the street." (Suppression Hearing Transcript, February 23, 1990 ("Tr."), at 4.)

The agents went to Apartment 226 and were admitted by someone whom they later learned was Julio Santana, the tenant of the apartment. Santana did not meet the description the officers had been given. There was also a young woman in the apartment. After advising Santana why they were there, the officers patted him down, and Santana gave them permission to search the apartment. They had been searching the one-room apartment for some 15 minutes without finding any narcotics when Salazar, a short, dark, Hispanic male, opened the door and entered the apartment. DeHart described the ensuing events as follows:

Q. Can you tell us what you noticed about Mr. Salazar as soon as he entered the apartment?

A. Myself and Agent Cota were standing near the doorway. It is a very small apartment. Right when he entered the apartment, we were all—we all had badges displayed. As soon as he walked in the door, I said, you know, "We're the police, Drug Enforcement."

He stepped up—he was standing between myself and Agent Cota. Mr. Salazar appeared nervous, was looking around at us.

. . . .

Q. Can you tell us now what you did when you noticed Mr. Salazar behaving nervously, as you said?

A. As I said, he was standing right between myself and Agent Cota. At that point we began to pat him down for weapons.

Q. While you were patting him down, what, if anything did you detect?

A. I was standing on the left side of Mr. Salazar, and as I was patting down his coat, when I reached his left coat pocket, it was a bulky coat, I squeezed the outside of the pocket and I felt what appeared to be a plastic—I heard and felt the crackling of plastic. I had a pretty good-sized handful of this item.

At that point I believed it was crack cocaine.

Q. Had you had occasion to feel crack cocaine in the form that you felt it that day before?

A. Yes.

Q. What did you do after you felt this object in the pocket?

A. Well, after I felt it, I reached into the pocket and I looked in the pocket and I could see plastic vials with white powder in them. I took one out and looked at it and I said to Agent Grabowski, who was the supervising agent there, and Agent Cota, I said, "He has crack cocaine".

(Tr. 5–7.) The agents then finished patting Salazar down, had him remove his jacket, and advised him that he was under arrest. Approximately 150 vials of crack were found in his pockets.

In support of his motion to suppress the crack vials seized from him, Salazar contended (1) that the agents had no sufficient basis to suspect him of any crime and hence had no basis for stopping him; and (2) that the agents had at most an articulable suspicion that Salazar was a drug dealer, not that he was an armed drug dealer, and hence had no permissible basis for patting him down for weapons.

In an Opinion and Order dated April 17, 1990 ("Decision"), 1990 WL 49047, the district court denied Salazar's suppression motion. It found that the informant had identified a specific apartment and had given a specific description of the drug dealer; that Salazar, who was not the lessor of the apartment, fit the description given by the informant and had entered the specified apartment unannounced; and that upon seeing the agents, Salazar appeared nervous and began glancing about. The court concluded that these circumstances, viewed as a whole, gave the officers a " 'reasonable suspicion that the [person] to be stopped [was] engaged in criminal activity,' ... and justified a *Terry* stop." Decision at 3 (quoting *United States v. Gaviria*, 740 F.2d 174, 181 (2d Cir.1984)). The court also concluded that the officers had a sufficient basis for patting Salazar down. It found, *inter alia*, that the agents were in a small apartment that they had reason to suspect

was being used for narcotics dealing; it noted that "drug dealers frequently go about armed," and that " 'a reasonably prudent man in the circumstances would be warranted in the belief that his safety or that of others was in danger,' ... and the agents were justified in taking steps to assure their safety by patting down Salazar." Decision at 5 (quoting *Terry v. Ohio*, 392 U.S. at 27, 88 S.Ct. at 1883). The court noted that when DeHart patted Salazar down he felt crackling plastic that he recognized as crack vials; detection of the crack vials gave the agents probable cause to arrest Salazar.

Following the denial of his suppression motion, Salazar entered a conditional plea of guilty and was sentenced as indicated above. This appeal followed.

## II. DISCUSSION

On appeal, Salazar does not challenge the factual findings of the district court; rather he contends that the findings cannot justify the conclusion that the stop and patdown were reasonable under the Fourth Amendment. For the reasons below, we are constrained to disagree.

Under *Terry v. Ohio* and its progeny, an officer who can point to specific and articulable facts that, together with rational inferences therefrom, would warrant a man of reasonable caution in the belief that a brief investigative stop is warranted, may make such a stop notwithstanding the absence of probable cause to arrest, 392 U.S. at 21–22, 88 S.Ct. at 1879–80; *Alabama v. White*, —— U.S. ——, 110 S.Ct. 2412, 2416, 110 L.Ed.2d 301 (1990); *United States v. Sokolow*, 490 U.S. 1, 7–8, 109 S.Ct. 1581, 1585, 104 L.Ed.2d 1 (1989); and in connection with such a stop, the officer may "tak[e] steps to assure himself that the person with whom he is dealing is not armed with a weapon that could unexpectedly and fatally be used against him," *Terry v. Ohio*, 392 U.S. at 23, 88 S.Ct. at 1881; *see, e.g., Adams v. Williams*, 407 U.S. 143, 92 S.Ct. 1921, 32 L.Ed.2d 612 (1972). "So long as the officer is entitled to make a forcible stop, and has reason to believe that the suspect is armed and dan-

gerous, he may conduct a weapons search limited in scope to this protective purpose." *Id.* at 146, 92 S.Ct. at 1923 (footnote omitted).

> When an officer is justified in believing that the individual whose suspicious behavior he is investigating at close range is armed and presently dangerous to the officer or to others, it would appear to be clearly unreasonable to deny the officer the power to take necessary measures to determine whether the person is in fact carrying a weapon and to neutralize the threat of physical harm.

*Terry v. Ohio*, 392 U.S. at 24, 88 S.Ct. at 1881.

■ In determining whether the information possessed by the officer provided a sufficient basis for an investigatory stop, the court is required to look at the totality of the circumstances. *See, e.g., Alabama v. White*, 110 S.Ct. at 2415; *United States v. Sokolow*, 490 U.S. at 7–8, 109 S.Ct. at 1585; *United States v. Cortez*, 449 U.S. 411, 417, 101 S.Ct. 690, 694–95, 66 L.Ed.2d 621 (1981). In *White*, which addressed the reasonableness of reliance on informants' tips, an officer had received an anonymous telephone call stating that "Vanessa White" would be leaving a certain building at a certain time in a brown Plymouth station wagon whose right taillight lens was broken, that she would be going to a certain motel, and that she would be in possession of about an ounce of cocaine inside a brown attaché case. The officer and his partner went to the designated building and saw in its parking lot a brown Plymouth station wagon with a broken right taillight. They saw a woman (eventually determined to be Vanessa White) leave the building empty-handed and enter the station wagon; they followed as she drove the most direct route toward the specified motel. They stopped her car before she reached the motel and informed her that she was suspected of carrying cocaine. Upon receiving permission to search, they found an attaché case in which there was marijuana, and a purse in which there were three milligrams of cocaine. While terming the case "close," the *White* Court concluded that "the anonymous tip, as corroborated, exhibited sufficient indicia of reliability to justify the investigatory stop of [White's] car." 110 S.Ct. at 2417.

Though different in focus, the description in the present case was not significantly less specific, over all, than that in *White;* and in some respects its reliability was greater than that of the *White* tip. The details given by the anonymous telephoner in *White* were the name of the suspect, the time of departure, the building from which she would be leaving, her destination, the description of the vehicle, and the statement that she would be carrying an attaché case. No apartment within the building was specified, and apparently, no physical description of "Vanessa White" was given. So far as appears, any woman departing from any apartment at that address at that time, driving the vehicle described, and proceeding in the direction of the specified motel would have been targeted by the officers. Before the officers stopped the vehicle, several of the details of the tip were not substantiated. The woman's identity was not verified; she had not reached the motel; and she had not been seen carrying an attaché case or anything else.

■ In the present case, the details provided by the informant included the address, the number of the apartment being used for the drug operation, and the assertion that the drugs were being sold both in the specified apartment and on the street. The informant gave four characteristics of the suspect: his height, coloring, gender, and ethnicity. These details arguably provided the officers with greater justification for questioning Salazar when he arrived at the designated apartment, of which he was not the tenant, than the corroborated details provided for the stop in *White*. The fact that Salazar, who had proven access to the apartment, was not the tenant meant that the tip was more likely to be based on actual observations of activities surrounding Apartment 226 than on a hostile fabrication against a person known to be the tenant of 226. Further, though the informant in the present case had not previously been relied on by the officers, a face-to-face

informant must, as a general matter, be thought more reliable than an anonymous telephone tipster, for the former runs the greater risk that he may be held accountable if his information proves false.

Plainly the information initially received by the officers in the present case made it reasonable for them to investigate by going to Apartment 226 at 312 West 93rd Street. The tenant of the apartment admitted them and gave them permission to search. They were thus lawfully on the premises when Salazar arrived. Salazar's arrival provided some corroboration for the tip, for Salazar met the informant's description of the drug dealer, and though he was not the tenant of the specified apartment he had access to it. These facts warranted at least some inquiry of Salazar upon his arrival. Being in the apartment lawfully, the officers were not required to leave upon Salazar's entrance; nor were they required to put themselves at risk of Salazar's having a gun. Noting that Salazar matched the informant's description of the drug dealer, being sufficiently experienced to know that narcotics dealers frequently carry weapons, *see, e.g., United States v. Crespo,* 834 F.2d 267, 271 (2d Cir.1987) ("to substantial dealers in narcotics, firearms are as much tools of the trade as are the commonly recognized articles of narcotics paraphernalia"), *cert. denied,* 485 U.S. 1007, 108 S.Ct. 1471, 99 L.Ed.2d 700 (1988), and noting that Salazar had become visibly nervous at learning that they were law enforcement officers, the officers had sufficient reason to pat him down immediately.

■ The court found that the pat-down resulted in DeHart's feeling the "crackling plastic, which betrayed the presence of crack vials." Decision at 2. Viewed in the light most favorable to the government, the evidence supports this finding, which, in any event, is not challenged on appeal. The fact that the pat-down revealed narcotics rather than a weapon did not make the frisk impermissible. Where the officers have been informed that a given person is dealing in narcotics, and during a permissible pat-down for weapons they feel something that their experience tells them is

narcotics, the pat-down gives them probable cause to search the suspect for drugs. *See generally United States v. Oates,* 560 F.2d 45, 61–63 (2d Cir.1977); *United States v. Vasquez,* 638 F.2d 507, 523–24 (2d Cir. 1980) (visual inspection of open bag to check for weapon was proper, based on reasonable suspicion that suspect was carrying narcotics and suspect's fidgeting; ensuing observation that bag contained a cereal box being used for something other than cereal caused reasonable suspicion to ripen into probable cause), *cert. denied,* 450 U.S. 970, 101 S.Ct. 1490, 67 L.Ed.2d 620 (1981). If the frisk for a weapon is conducted in compliance with proper standards and results in recognition of the likely presence of narcotics, "it is immaterial that what was discovered is not the article for which the police officers were originally and specifically looking." *United States v. Oates,* 560 F.2d at 63.

In sum, given the totality of the circumstances, we conclude that the informant's tip, together with Salazar's arrival at the apartment, his fitting the description of the alleged drug dealer, and his nervousness upon the officers' identification of themselves, provided the officers, who were lawfully on the premises, with a sufficient basis to conduct an immediate pat-down of Salazar. Once the permissible pat-down reasonably caused the agents to believe there were crack vials in his pocket, they had probable cause to search his pockets. The district court properly denied Salazar's motion to suppress.

## CONCLUSION

We have considered all of Salazar's arguments on this appeal and have found them to be without merit. The judgment of conviction is affirmed.

Judge OAKES dissents, in a separate opinion.

OAKES, Chief Judge, dissenting:

Contrary to the majority's assertion, I believe that the anonymous tip in this case was "significantly less specific" and reliable than the tip in *White,* and thus that the pat down of Salazar was unlawful.

I read *White* with a somewhat different lens than the majority. Prior to stopping

the defendant, the police in *White* fully corroborated three details of the anonymous tip—a woman's departure from a certain building, her use of a brown Plymouth station wagon with a broken light, and the time frame of her departure. The police also partially corroborated a fourth detail— the suspect's travel toward a specific motel. *See id.* 110 S.Ct. at 2416–17. In addition to these points of corroboration, the tip's detail concerning facts that were not easily obtainable, such as the make of the suspect's car, and the informant's ability to predict the suspect's future activity, led the Court to conclude that the tip was sufficiently reliable to establish reasonable suspicion and hence make the stop lawful. *See id.* at 2416–17. In so holding, however, the Court declared that the tip alone would not have justified an investigatory stop. *See id.* at 2416.

The question before us, then, is, given the fact that an anonymous tip alone is insufficient for a finding of reasonable suspicion, and given the Court's characterization of *White* as a "close" case, does this case surpass the reasonable suspicion threshold? I believe it does not. In contrast to the rather detailed tip in *White*, the tip here had only two components—an extremely general physical description of the suspect and a prediction as to the suspect's future activity. The agents here had fully corroborated only one of the details of the tip prior to making the stop—the physical description of the suspect. This aspect of the tip, however, was vague ("a short dark Hispanic male") and, given the ethnic composition of the neighborhood, could have encompassed literally thousands of people. The physical description also did not refer to any specific details, such as manner of dress or facial hair, that would have indicated that the informant had a particular individual in mind. Additionally, the agents had only partially corroborated the second aspect of the tip, the suspect's travel route to and from the apartment before making the stop. They saw Salazar in the apartment, but did not know where he was coming from, or if he planned to leave later

for the street. At best, we have one and a half points of corroboration of what was an extremely general tip.

Moreover, it appears that whatever slight reliability the tip may have had was actually undercut by the police's own activity. Specifically, the agents' unsuccessful search of the apartment for drug paraphernalia, undertaken prior to making the stop, put the reliability of the tip considerably in doubt. For, the implication of the suspect's travel to and from the apartment was that the suspect was taking drugs from the apartment and then selling them on the street. The fact that the agents did not recover any drugs, therefore, cast doubt upon the reliability of the tip right away.[1]

The majority unwisely embraces the Government's assertion that, in addition to the tip, Salazar's "visible nervousness" provided reasonable suspicion for the stop finds no support in fact or law. As the majority notes, the test for reasonable suspicion is an objective one. In contrast to the case on which the Government relies, *United States v. Ramirez–Cifuentes*, 682 F.2d 337 (2d Cir.1982), however, there are no objective facts here to buttress the agents' characterization of Salazar's behavior as nervous. In *Ramirez–Cifuentes*, the agents' observation of the defendant's nervous demeanor was based on objectively quantifiable aspects of the defendant's behavior—constant glancing about, rapidly walking through a narrow walkway, and repeated backward glances. *See id.* at 342. The portion of the trial transcript quoted by the majority illustrates that such facts are absent here. Looking "around at" the agents who had just identified themselves as law enforcement officers is not in and of itself evidence of a crime. For, under such a thought regime, one could say with equal conviction that a suspect's *failure* to make eye-contact with law enforcement officers is evidence of guilt. Eye-movement alone is simply not the stuff from which guilt or innocence is made. We are thus left only with the agents' subjective judgment of Salazar's demeanor, which could not possibly have provided objectively reasonable grounds for an investigatory stop.

1. I am not persuaded by the majority's assertion that the fact that Salazar was not the tenant of

the apartment decreases the chance that the tip was a "hostile fabrication" of the informant.

Lastly, the majority's statement that "a face-to-face informant must, as a general matter, be thought more reliable than an anonymous telephone tipster, for the former runs the greater risk that he may be held accountable if his information prove false," is, at the very least, misplaced; the agents here did not know the identity of the tipster and there was no indication that the agents ever would have any further contact with him. Whether an anonymous tip is delivered in person or over the telephone wires has little if any impact on the reliability of the tip. Whereas, whether the police will have future dealings with the tipster, and thus whether the tipster has a stake in the veracity of the information, is a true gauge of reliability. We have no evidence that the tipster had such a personal investment in the veracity of the information.

For these reasons, I conclude that neither the detail of the tip itself, nor the quantity or quality of subsequent collaboration, even approximate those present in *White.* This case in my view does not present a "close" case for an investigatory stop, but rather, no case at all.