483 S.E.2d 273

**STATE of West Virginia, Plaintiff Below, Appellee,**

v.

**Dominique RAHMAN, Defendant Below, Appellant.**

**No. 23329.**

Supreme Court of Appeals of West Virginia.

Submitted Sept. 24, 1996.

Decided Dec. 20, 1996.

148

Mary Beth Kershner and William Jones, Assistant Prosecuting Attorneys for Kanawha County, Charleston, for Appellee.

Stephen D. Warner, Managing Deputy Public Defender, Charleston, for Appellant.

WORKMAN, Justice:

Dominique Rahman appeals[1] his conviction on four felony counts of possession of heroin with intent to deliver. He asserts six errors: (1) the trial court erred by denying a motion to exclude heroin found inside the Appellant's jacket pocket; (2) the trial court should have declared a mistrial after the prosecutor asked the Appellant during cross-examination whether he had ever sold heroin before; (3) separation of the charges into four counts violated the Double Jeopardy Clause; (4) there was insufficient evidence to support the conviction on count two; (5) defense counsel should have been allowed to impeach a co-defendant with prior misdemeanor convictions; and (6) the court erred by denying the Appellant's *Batson* challenge to the State's peremptory strike of a black juror. *See Batson v. Kentucky,* 476 U.S. 79, 106 S.Ct. 1712, 90 L.Ed.2d 69 (1986). For the reasons set out below, we affirm the judgment of the circuit court, but remand the case for a hearing on the validity of the peremptory strike.

On April 7, 1995, the Charleston drug unit outfitted a confidential informant ("CI") with a body wire, gave him $180 in recorded bills, and directed him to attempt to purchase heroin. Officers dropped the CI off near the residence of Albert Parker, and kept him under both visual surveillance and audio surveillance via the body wire. The CI gave the money to Albert Parker, who said he would return shortly with the heroin. Officer William Hart continued to watch the CI, while officers Steven Neddo and Randy Mayhew followed Parker as he drove to the Day's Inn near St. Albans. At the Day's Inn, the officers watched Parker enter room 269, and exit a few minutes later. Officer Neddo remained watching room 269, as did Captain Larry Dodson, who had been watching the Days' Inn all day. Detective Mayhew followed Parker back to Charleston, and waited for word from Officer Hart. After being advised by Hart that Parker had delivered two packets of heroin to the CI, Detective Mayhew stopped Parker while he was walking home, and Parker agreed to cooperate with the police. Parker went to the drug unit office, where he told police he had purchased heroin from someone named "Turbo," in room 269 of the Day's Inn, and described Turbo as a tall black male with a ponytail. During this time, Officers Neddo and Dodson continued to watch room 269 at the Days' Inn. They observed two black males repeatedly come out of room 269 onto the landing and return to the room. Soon thereafter, they saw the two men, one of whom matched Turbo's description, leave room 269 and start to drive away. The officers pulled the car over.

Captain Dodson informed the Appellant, who matched Parker's description of Turbo, that he was the subject of a heroin investigation, and that Dodson was going to search him for any weapons, needles or heroin. Dodson did a pat-down, and felt a bulge in one of the Appellant's jacket pockets. He thought the bulge felt like heroin packets. He reached into the pocket and found eight packages or bundles of heroin marked "the bomb." After he found the heroin, Dodson conducted a full search incident to an arrest, including all pockets and shoes and socks.

Officer Neddo and another officer then went to room 269. Sandra Wright was in the room. The officers asked if anyone else was there. She said no, and gave them permission to look around. The officers saw two packets of ten bundles each of heroin lying beside the sink in an area that was part of the main room. This heroin was also marked "the bomb." The Appellant and the other male, Keith Ellison, were brought back to the room. The Appellant said that the room was his, and signed a written consent to search. A search produced $2,410 in small bills from the nightstand, including $120 of the recorded currency that had been given to the CI that morning.

---

1. The Honorable Arthur M. Recht resigned as Justice of the West Virginia Supreme Court of Appeals effective October 15, 1996. The Honorable Gaston Caperton, Governor of the State of West Virginia, appointed him Judge of the First Judicial Circuit on that same date. Pursuant to an administrative order entered by this Court on October 15, 1996, Judge Recht was assigned to sit as a member of the West Virginia Supreme Court of Appeals commencing October 15, 1996 and continuing until further order of this Court.

Ten days later, on April 17, 1995, an employee of Massey Vending Company was servicing a vending machine at the Day's Inn. He dropped his keys, and when he bent to pick them up he noticed a bag tucked inside the machine where the cooling unit sits. He turned the bag over to the police. It contained a digital scale, some ammunition, and about seventy bundles of heroin. The bundles were marked "the bomb," as was the heroin found on the Appellant and in his hotel room, as well as the heroin Parker sold to the CI.

The Appellant was charged with four counts of possession of heroin with intent to distribute, based on: (1) the transaction with Parker and the CI; (2) the heroin found in the Appellant's jacket pocket; (3) the heroin in plain view next to the sink in the hotel room; and (4) the heroin found in the vending machine ten days later. The case was tried on July 14–18, 1995. The jury convicted the Appellant on all four counts. The court sentenced him to four consecutive sentences of one-to-fifteen years.

 We address first the admissibility of the heroin found by police in the Appellant's jacket pocket. The Appellant does not contest the validity of the stop, but asserts that police exceeded the scope of a valid "stop and frisk" by reaching inside his jacket pocket to recover the heroin. With regard to the "stop and frisk" exception to the Fourth Amendment's prohibition of unreasonable search and seizure, this Court has held:

> Where a police officer making a lawful investigatory stop has reason to believe that an individual is armed and dangerous, that officer, in order to protect himself and others, may conduct a search for concealed weapons, regardless of whether he has probable cause to arrest the individual for a crime. The officer need not be certain

that the individual is armed; the inquiry is whether a reasonably prudent man would be warranted in the belief that his safety or that of others was endangered. *U.S. Const.* amend. IV. W.Va. Const. art. III, § 6.

Syl. Pt. 3, *State v. Choat*, 178 W.Va. 607, 363 S.E.2d 493 (1987). This exception gives officers the authority to conduct a limited patdown for weapons. *Id.* at 613, 363 S.E.2d at 499. The Appellant asserts that the warrantless search of the inside of his jacket pocket was not reasonably related in scope to the circumstances which justified the initial stop. He cites *State v. Hlavacek*, 185 W.Va. 371, 407 S.E.2d 375, 380 (1991), in which this Court concluded that a search was unconstitutional when a police officer required a suspect to empty his pockets incident to a frisk. The Appellant asserts that in his case, as in *Hlavacek*, the scope of a reasonable frisk for weapons was exceeded.[2]

 It is not necessary, however, to rely on the stop and frisk exception in this case. It appears from the record that the police had probable cause to arrest the Appellant prior to the stop, and thereby had the authority to make a full search incident to the arrest. " ' "Probable cause to make an arrest without a warrant exists when the facts and circumstances within the knowledge of the arresting officers are sufficient to warrant a prudent man in believing that an offense has been committed." Point 1 Syllabus, *State v. Plantz*, [155] W.Va. [24] [180 S.E.2d 614].' Syllabus Point 3, *State v. Duvernoy*, 156 W.Va. 578, 195 S.E.2d 631 (1973)." Syl. Pt. 7, *State v. Craft*, 165 W.Va. 741, 272 S.E.2d 46 (1980). When Officers Dodson and Neddo stopped the Appellant's car, they had reliable information that Parker had purchased heroin in room 269 of the Day's Inn, they had seen the Appellant emerge from room 269, and they had a de-

---

**2.** Although our decision does not rely on this basis, we note that where the stop and frisk is justified, the feel of an object other than a weapon, together with other suspicious circumstances, may amount to probable cause for a further search. In *United States v. Salazar*, 945 F.2d 47 (2d Cir.1991), *cert. denied*, 504 U.S. 923, 112 S.Ct. 1975, 118 L.Ed.2d 574 (1992), for example, the court held that when in a pat-down of a suspected drug dealer officers "feel some-

thing that their experience tells them is narcotics, the pat-down gives them probable cause to search the suspect for drugs." 945 F.2d at 51; *see also* 4 W. LaFave, *Search and Seizure* § 9.5(c) at 280 n. 189. Captain Dodson testified that while patting the Appellant down for weapons he felt something that he thought was packets of heroin, and that he had years of experience with heroin and how bundles of heroin looked and felt.

scription of "Turbo," which matched the Appellant. This constituted probable cause to make an arrest. Once it is established that there was sufficient probable cause to sustain the arrest, this Court has recognized that "[a] warrantless search of the person and the immediate geographic area under his physical control is authorized as an incident to a valid arrest." Syl. Pt. 6, *State v. Moore,* 165 W.Va. 837, 272 S.E.2d 804 (1980), *overruled on other grounds by State v. Julius,* 185 W.Va. 422, 408 S.E.2d 1 (1991). We therefore conclude that the seizure of heroin from the Appellant's jacket pocket was within the scope of a valid search incident to his arrest, and the circuit court did not err by refusing to exclude it from evidence.

 The Appellant next asserts that the trial court should have granted a mistrial after the State asked the Appellant on cross-examination, "Have you ever sold heroin before?" The defense attorney immediately objected, and the line of questioning was dropped after a bench conference.[3] The Appellant asserts that this question regarding another crime was prohibited under syllabus point eleven of *State v. Thomas,* 157 W.Va. 640, 203 S.E.2d 445 (1974). This rule is now codified in Rule 404(b) of the West Virginia Rules of Evidence: [4]

> Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show that he or she acted in conformity therewith. It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident, provided that upon request by the accused, the prosecution in a criminal case shall provide reasonable notice in advance of trial ... of the general nature of any such evidence it intends to introduce at trial.

Assuming that the State's question was improper, the State asserts that it was harmless error, and we agree. This Court articulated the standards for nonconstitutional harmless error in syllabus point two of *State v. Atkins,* 163 W.Va. 502, 261 S.E.2d 55 (1979), *cert. denied,* 445 U.S. 904, 100 S.Ct. 1081, 63 L.Ed.2d 320 (1980):

> Where improper evidence of a nonconstitutional nature is introduced by the State in a criminal trial, the test to determine if the error is harmless is:
>
> (1) the inadmissible evidence must be removed from the State's case and a determination made as to whether the remaining evidence is sufficient to convince impartial minds of the defendant's guilt beyond a reasonable doubt; (2) if the remaining evidence is found to be insufficient, the error is not harmless; (3) if the remaining evidence is sufficient to support the conviction, an analysis must then be made to determine whether the error had any prejudicial effect on the jury.

In addition, the Court in *Atkins* set out factors to be considered in evaluating the prejudicial impact of the error, including whether the error was repeated or singled out for special emphasis in the State's argument; whether the error became the subject of a special instruction to the jury, or produced a question from the jury; the overall quality of the State's proof; whether the error was related to critical testimony of the defendant; and the cumulative effect of the error in the context of the entire trial. 163 W.Va. at 514–15, 261 S.E.2d at 62–63. The Court in *Atkins* concluded, based on that analysis, that the erroneous admission into evidence of the defendant's two prior criminal convictions in that case was harmless error. *Id.* at 516, 261 S.E.2d at 63.

---

**3.** The prosecutor apparently believed that the Appellant would have to answer in the affirmative, because police records reflected a four-year prison term for a drug-related offense. In truth, however, the Appellant had been convicted of possession of cocaine, marijuana and hashish, but not distribution, and not heroin.

**4.** The State explains in its brief that it was attempting to impeach the Appellant with the evidence of prior convictions. We note that West Virginia Rule of Evidence 609(a)(1) ordinarily would not permit such a use: "For the purpose of attacking the credibility of a witness accused in a criminal case, evidence that the accused has been convicted of a crime shall be admitted *but only if the crime involved perjury or false swearing.*" (emphasis added).

Applying these factors to the case before us, we reach the same conclusion. Evidence of the Appellant's prior conviction was never actually introduced, so its removal from the State's case does not affect the sufficiency of the evidence. Our analysis must focus, therefore, on whether the question itself had a prejudicial effect on the jury. In the present case, we do not find any of the *Atkins* factors. The State asked the question once, it went unanswered, and it was not repeated or mentioned again in the course of the trial. Defense counsel did not request an instruction regarding this issue, and none was given.[5] The record does not reflect that the jury asked about it. The overall quality of the State's proof was strong, and the error did not relate to critical testimony of the defendant.[6] Based on these factors, and in the context of the entire trial, we find this error to have been harmless.

■ The Appellant also asserts that charging him with four counts of possession with intent to deliver, and the imposition of consecutive sentences, violates the Double Jeopardy Clause of the United States and West Virginia Constitutions. *See* U.S. Const. amend. V; W.Va. Const. art. 3, § 5. Counts two through five of the indictment were based on (1) the transaction with Parker and the CI; (2) the heroin found in the Appellant's jacket pocket; (3) the heroin in plain view next to the sink in the hotel room; and (4) the heroin found in the vending machine ten days later. The Appellant asserts that his possession of one drug, heroin, in four places in and around his hotel room should be viewed as a single offense. The State responds that separate counts are justified, because each count required proof of different facts.

■ The Double Jeopardy Clause protects against both a second prosecution for the same offense and the imposition of multiple punishments for the same offense. Syl. Pt. 1, *State v. Gill,* 187 W.Va. 136, 416 S.E.2d 253 (1992); Syl. Pt. 1, *Conner v. Griffith,* 160 W.Va. 680, 238 S.E.2d 529 (1977). The Appellant's claim must be analyzed within the framework set out by this Court in syllabus points seven and eight of *Gill:*

7. A claim that double jeopardy has been violated based on multiple punishments imposed after a single trial is resolved by determining the legislative intent as to punishment.

8. In ascertaining legislative intent, a court should look initially at the language of the involved statutes and, if necessary, the legislative history to determine if the legislature has made a clear expression of its intention to aggregate sentences for related crimes. If no such clear legislative intent can be discerned, then the court should analyze the statutes under the test set forth in *Blockburger v. United States,* 284 U.S. 299, 52 S.Ct. 180, 76 L.Ed. 306 (1932), to determine whether each offense requires an element of proof the other does not. If there is an element of proof that is different, then the presumption is that the legislature intended to create separate offenses.

187 W.Va. at 138, 416 S.E.2d at 255. In *State v. Broughton,* 196 W.Va. 281, 290–91, 470 S.E.2d 413, 422–23 (1996), this Court, using the *Gill* analysis, held that separate convictions for delivery of cocaine and marijuana in the same transaction did not violate the double jeopardy clause. In so holding, the Court described the applicable standard as a "same evidence" test: "Under this anal-

---

5. When the State finished its cross-examination of the Appellant, defense counsel moved for a mistrial based on the question, "Have you ever sold heroin before?" The court denied the motion, saying that she would tell the jury in the final charge that they should consider the testimony of witnesses only, and not the comments, arguments, or questions of counsel. She indicated a desire not to emphasize the question by focusing on it.

6. Although the question followed immediately after Appellant's denial that he had sold heroin to Albert Parker, this denial on cross-examination was less critical than his direct testimony about the events in question. In addition, other evidence, including police observation of the Days' Inn, police testimony about the marked bills, Parker's testimony, and the fact that the heroin purchased by Parker was marked "the bomb," made it unlikely that the State's question altered the jury's perception of the Appellant's testimony.

ysis, multiple punishments are permissible 'as long as each charge meriting punishment requires at least one piece of evidence that is not needed to prove other charges.'" *Id.* at 290, 470 S.E.2d at 422 (quoting *State v. Myers,* 171 W.Va. 277, 281, 298 S.E.2d 813, 817 (1982)); *see also State v. Zaccagnini,* 172 W.Va. 491, 308 S.E.2d 131 (1983) (holding that possession of LSD and cocaine with intent to deliver did not constitute the same offense).

The Appellant asserts that, unlike the defendants in *Zaccagnini* and *Broughton,* he possessed only one kind of drug, heroin. He points to this Court's decision in *State v. Barnett,* 168 W.Va. 361, 284 S.E.2d 622 (1981), which held that delivery of two controlled substances in the same statutory category at the same time and place to the same person was one offense. *Id.* at 365, 284 S.E.2d at 624. We agree with the State, however, that *Barnett* does not control this case, because the charges against the Appellant are not based on delivery "at the same time and place to the same person." *See id.*

Our conclusion is supported by the decisions of numerous federal courts. In *United States v. Privett,* 443 F.2d 528 (9th Cir.1971), for example, the Ninth Circuit upheld a conviction on three separate counts relating to the defendant's possession of heroin in a shirt pocket, under the front seat of his vehicle, and in the trunk of his vehicle. 443 F.2d at 531. The Appellant contends that *Privett* is not analogous to his case because the heroin in the three locations was of different purities, and the sentences in *Privett* were concurrent, not consecutive. The Ninth Circuit's holding, however, was based on the conclusion that "different proof was required as to each of the three counts." *Id.* Moreover, the Eighth Circuit, in *United States v. Rich,* 795 F.2d 680 (8th Cir.1986), upheld separate convictions for possession of drugs in the defendant's home, on his person, and in his luggage. The defendant in *Rich* contended that he could only be charged once for each type of drug he possessed, regardless of how many locations it was kept in. 795 F.2d at 682. There, the court upheld the conviction on all counts, and the consecutive sentences imposed, saying that "[a]n activity creates multiple offenses when each count requires proof of an additional fact which the other does not." *Id.*

The Appellant would have us look to *United States v. Williams,* 480 F.2d 1204 (6th Cir.1973), which held that four packets of heroin found on the defendant's premises would not support four separate charges of possession of heroin.[7] The heroin in *Williams,* however, was all found in one safe. That is not the situation before us. As in *Rich,* each count in this case required proof of separate facts, and we therefore conclude that the Appellant's conviction and consecutive sentencing on four counts of possession with intent to deliver did not violate the Double Jeopardy Clause.

Closely related to the Double Jeopardy issue is the Appellant's assertion that there was insufficient evidence to support his conviction on count two, possession with intent to deliver the heroin sold to Albert Parker. The Appellant contends that the State offered no proof that the heroin sold to Parker had been possessed in a place separate from the heroin in the Appellant's jacket pocket or the heroin found beside the bathroom sink. Based on our discussion of Double Jeopardy above, we find no error, because the State was required to prove all the elements of possession with intent to deliver with respect to the heroin sold to Parker, and doing so required proof of additional facts not required to prove the other counts.

Next we address the Appellant's assertion that he should have been allowed to impeach Albert Parker with a prior conviction for shoplifting.[8] After Albert Parker

---

7. *Williams* was cited with approval by this Court in *Zaccagnini. See* 172 W.Va. at 501, 308 S.E.2d at 141.

8. The Appellant also contends that he should have been allowed to impeach Parker with a prior conviction for uttering a forged prescription. In a bench conference following defense counsel's question regarding the shoplifting conviction, Appellant's counsel indicated that he also wanted to impeach Parker with a prior conviction for uttering. The trial court indicated that the conviction would be allowed if the offense was a felony and instructed Appellant's counsel to find out whether the uttering conviction was a felony or a misdemeanor. *See* W. Va. R. Evid.

testified about his purchase of heroin from the Appellant, defense counsel asked, "You were convicted of shoplifting in 1991, right?" The State moved to strike, and the court in a bench conference ruled that the Parker's conviction for shoplifting was inadmissible, because it is not an offense involving dishonesty or false statement under West Virginia Rule of Evidence 609(a)(2)(B). As set out in syllabus point two of *CGM Contractors, Inc. v. Contractors Environmental Services, Inc.,* 181 W.Va. at 680, 383 S.E.2d at 862 (1989).

Rule 609(a)(2) of the West Virginia Rules of Evidence divides the criminal convictions which can be used to impeach a witness other than a criminal defendant into two categories: (A) crimes "punishable by imprisonment in excess of one year," and (B) crimes "involving dishonesty or false statements regardless of the punishment."

Shoplifting is not punishable by imprisonment in excess of one year, so this conviction was not admissible unless it involved dishonesty or false statement. Although shoplifting involves an element of dishonesty, crimes that typically may be used for impeachment under Rule 609(a)(2)(B) are "in the nature of perjury or subornation of perjury, false statement, criminal fraud, embezzlement, false pretense, or any other offense which involves some element of deceitfulness, untruthfulness, or falsification bearing on a witness' propensity to testify truthfully." *CGM Contractors,* 181 W.Va. at 682 n. 1, 383 S.E.2d at 864 n. 1 (quoting *Black's Law Dictionary*).

 In *State v. Jenkins,* 191 W.Va. 87, 443 S.E.2d 244 (1994), the Court upheld the exclusion of a prior conviction for larceny, saying:

Although there has been some disagreement, "federal courts and most state courts are unwilling to conclude that offenses such as petty larceny, shoplifting, robbery, possession of a weapon, and narcotics violations are per se crimes of 'dishonesty and false statement.' "

*Id.* at 91, 443 S.E.2d at 248 (quoting John W. Strong et al., *McCormick on Evidence* § 42 at 146 (4th ed.1992)). This Court addressed only recently the issue of whether a misdemeanor conviction should be admitted under Rule 609(a)(2)(B). Syllabus point five of *Wilkinson v. Bowser,* 199 W.Va. 92, 483 S.E.2d 92 (1996), states: "Evidence that a witness other than the accused in a criminal case has been convicted of a crime is admissible for the purpose of impeachment under West Virginia Rule of Evidence 609(a)(2)(B) when the underlying facts show that the crime involved dishonesty or false statement." In the case before us the Appellant offered no evidence that Parker's shoplifting conviction was based on facts showing dishonesty or false statement, and the conviction was therefore properly excluded by the trial court.

The Appellant's final charge is that his rights under the Equal Protection Clause of the Fourteenth Amendment to the United States Constitution were violated by the prosecutor's peremptory strike of a black juror. The Appellant, who is black, maintains that the State's failure to strike a similarly situated white juror shows that the strike was racially motivated. The State responds, first, that the Appellant may not have made a prima facie case of discrimination because the State left one black male on the panel, second, that even if the Appellant established a prima facie case, the prosecution articulated a credible, non-racial reason for striking Mr. Foxworth from the jury, and third, that it was under no obligation to give a credible, neutral reason for its failure to strike the similarly situated white juror. The facts surrounding the peremptory strike are as follows.

During voir dire, two prospective jurors indicated that they had experience working with patients who had substance abuse problems. Darrell Foxworth, a black male, said he had worked as a counselor at the West Virginia Rehabilitation Center, and Claudia Bator, a white female, said that she managed

---

609(a)(1). The record does not reflect, and the Appellant does not represent, that the Appellant ever proceeded to offer it. Because the uttering conviction was never offered at trial, no ruling was made on it, and we will not address it on appeal. *See* Syl. Pt. 1, *State Rd. Comm'n v. Ferguson,* 148 W.Va. 742, 137 S.E.2d 206 (1964).

a psychiatric unit, which included alcohol and drug patients. During additional voir dire, the prosecutor asked to further question Mr. Foxworth, who explained that he had done a six-month college internship in which about twenty percent of his job involved talking to substance abuse patients. He explained that he wasn't a licensed counselor, and that his role had been primarily to observe. At the time of trial, he was employed at Shawnee Hills as a case manager, and no longer worked with substance abuse patients. Mr. Foxworth was one of two black veniremen and the State did not challenge the other one, Mr. Black. The State did not ask any further questions of Ms. Bator, and did not strike her from the panel.

Counsel for the defendant challenged the State's peremptory strike of Mr. Foxworth, citing *Batson*, which is discussed below. The trial court asked the State to provide a reason for its strike. The prosecutor stated that it had been a regular part of Mr. Foxworth's job during the six-month internship to listen to explanations of how people became addicted to or had problems with drugs. This, he explained, raised a concern that the cumulative effect of listening to these one-sided explanations for drug use might affect the prospective juror's ability to be impartial in a trial for possession and distribution of drugs. Defense counsel then raised the issue of Ms. Bator, saying that the State's failure to question her further, even though her job also involved working with drug and alcohol patients, gave the impression that the State was singling out the black venireman. The prosecution responded that it had provided a legitimate, objective reason with respect to juror Foxworth, and thus had satisfied its burden. The court asked whether Mr. Black was still on the jury. The parties responded that he was, and stated on the record that Mr. Black was a black male. The court then said, "All right. You made your motion. I think that there's been some legitimate basis shown."

In *State v. Marrs*, 180 W.Va. 693, 379 S.E.2d 497 (1989), this Court examined whether a prosecutor's use of a peremptory challenge to strike the only remaining prospective black juror violated the defendant's right to equal protection. There, we held: "It is a violation of the Equal Protection Clause of the Fourteenth Amendment to the U.S. *Constitution* for a member of a cognizable racial group to be tried on criminal charges by a jury from which members of his race have been purposely excluded." *Id.*, Syl. Pt. 1. In *Marrs*, we adopted the standard established by the United States Supreme Court in *Batson* for proving that use of a peremptory challenge constitutes a violation of equal protection:

> To establish a prima facie case for a violation of equal protection due to racial discrimination in the use of peremptory jury challenges by the State, "the defendant first must show that he is a member of a cognizable racial group, and that the prosecutor has exercised peremptory challenges to remove from the venire members of the defendant's race. Second, the defendant is entitled to rely on the fact, as to which there can be no dispute, that peremptory challenges constitute a jury selection practice that permits 'those to discriminate who are of a mind to discriminate.' Finally, the defendant must show that these facts and any other relevant circumstances raise an inference that the prosecutor used that practice to exclude the veniremen from the petit jury on account of their race." [Citations omitted.] *Batson v. Kentucky*, 476 U.S. 79 at 96, 106 S.Ct. 1712 at 1722, 90 L.Ed.2d 69 (1986).

Syl. Pt. 2, *Marrs*, 180 W.Va. at 693–94, 379 S.E.2d at 497–98. If the defendant establishes a prima facie case under *Batson* (step 1), the burden of production shifts to the prosecution to articulate a race-neutral explanation (step 2). If the State tenders such an explanation, the trial court must decide (step 3) whether the defendant has proved purposeful racial discrimination, i.e., whether the stated reason was a pretext. *Purkett v. Elem*, 514 U.S. 765, 767, 115 S.Ct. 1769, 1770–71, 131 L.Ed.2d 834, 839(1995); *Hernandez v. New York*, 500 U.S. 352, 358–59, 111 S.Ct. 1859, 1865–66, 114 L.Ed.2d 395 (1991); *Batson*, 476 U.S. at 96–98, 106 S.Ct. at 1722–24; *State v. Kirkland*, 191 W.Va. 586, 595, 447 S.E.2d 278, 287 (1994). The last two steps were summarized in syllabus

point three of *Marrs:* "The State may defeat a defendant's prima facie case of a violation of equal protection due to non-racial discrimination in selection of a jury by providing nonracial, credible reasons for using its peremptory challenges to strike members of the defendant's race from the jury." [9] 180 W.Va. at 694, 379 S.E.2d at 498.

We address first the State's position that the Appellant may not have a valid claim under *Batson* because one of the remaining jurors was black. We concur with the majority of courts that have considered this issue and have concluded rightly that striking even a single black juror for racial reasons violates equal protection, even though other black jurors remain on the panel. *See, e.g., Coulter v. Gramley,* 93 F.3d 394, 396 (7th Cir.1996); *United States v. Clemons,* 843 F.2d 741, 747 (3d Cir.), *cert. denied,* 488 U.S. 835, 109 S.Ct. 97, 102 L.Ed.2d 73 (1988); *United States v. Battle,* 836 F.2d 1084, 1086 (8th Cir.1987); *but cf. United States v. Montgomery,* 819 F.2d 847, 851 (8th Cir.1987) (fact that jury included two blacks when prosecution could have struck them shows lack of intent to exclude blacks from jury). The focus of the trial court's analysis should be on whether the State's reason for a challenged strike is pretextual, and not on the overall composition of the jury.

We turn now to the effect of the State's disparate treatment of Mr. Foxworth and Ms. Bator. We are not the first Court to address a defendant's allegations that a prosecutor's peremptory strike of minority venirepersons and failure to strike similarly situated white venirepersons revealed a racially motivated strike. In *Jones v. Ryan,* 987 F.2d 960 (3d Cir.1993), for example, the State used a peremptory strike to remove a black prospective juror named Idonia Young.[10] The prosecutor's explanation for striking Ms. Young was that she had a twenty-year-old son, and it was the prosecutor's policy to avoid putting anyone on the jury who had a child of approximately the same age as the

defendant. 987 F.2d at 973. The Third Circuit found that the presence of two white jurors who possessed the same characteristic indicated that the State's explanation was pretextual. *Id.* The court concluded that the reasons proffered by the prosecutor to strike three black jurors, including Ms. Young, were not " 'neutral explanations related to the particular case to be tried[,]' " and granted the petitioner's writ of habeas corpus on that basis. *Id.* at 975 (quoting *Batson,* 476 U.S. at 98, 106 S.Ct. at 1724). The opposite conclusion was reached by the Fifth Circuit in *United States v. Mixon,* 977 F.2d 921 (5th Cir.1992), in which the government used five of its six peremptory challenges against blacks. The government explained the strikes as due to low levels of education and non-supervisory positions at work, noting that the case was based on circumstantial evidence and the jurors would need to grasp the nuances. There, the court deferred to the circuit court's determination that the reasons given for the strikes were credible and race-neutral. *Id.* at 923; *accord, United States v. Lance,* 853 F.2d 1177 (5th Cir.1988).

Our review of the relevant case law leads us to adopt the following standard. In assessing a *Batson* challenge, the trial court must consider a party's assertion that a similarly situated prospective juror was not challenged, both in determining whether the defendant has stated a prima facie case of discrimination, and in deciding whether the explanation given by the prosecution was a pretext for racial discrimination. In order for the trial court to make the latter determination, the State must articulate a credible reason for the different treatment of similarly situated black and white jurors.

The Appellant has established that he is a member of a cognizable racial group, and that the prosecutor used a peremptory challenge to exclude a member of his race from the jury. The allegation that

---

**9.** In *State ex rel. Azeez v. Mangum,* 195 W.Va. 163, 465 S.E.2d 163 (1995), for example, this Court determined that a prospective juror's prior acquaintance with the chief investigating officer was a valid, non-racial reason for a peremptory strike. *Id.* at 172, 465 S.E.2d at 172.

**10.** The State in *Jones* struck three black venirepersons, and left others on the jury. 987 F.2d at 972–73. The facts with respect to prospective juror Young are the most similar to those in the case before us.

the State challenged Mr. Foxworth while allowing a similarly situated white venireperson to remain on the jury was a "relevant circumstance" to be considered by the trial judge in determining whether the defendant stated a prima facie case of a *Batson* violation. Although the trial judge did not state on the record that a prima facie case had been made, we will assume for purposes of this opinion that it was, because she then asked the prosecutor to give an explanation. That explanation, Mr. Foxworth's exposure to one-sided reasons for drug use, was determined by the trial court to be a credible, nonracial reason for the strike.[11] When the State explained the strike in a racially neutral way, it then became the duty of the trial court to decide whether the reason given by the State was pretextual. The State's failure to strike a white female who appeared to come within the prosecutor's reason for striking Mr. Foxworth from the jury is an important factor in this determination. In accord with our holding above, the State was obligated to explain why it did not challenge this similarly situated juror. Because it did not do so, we remand this case to the circuit court for a hearing on the Appellant's *Batson* challenge. On such remand, the circuit court should give the State an opportunity to explain the inconsistency and should then determine whether the reason is a pretext for racial discrimination.

In *State v. Kirkland*, 191 W.Va. 586, 447 S.E.2d 278 (1994), we noted that this Court affords great weight to the findings of the trial court on the issue of whether purposeful discrimination has been established. Quoting the United States Supreme Court, we stated:

> [T]he trial court's decision on the ultimate question of discriminatory intent represents a finding of fact of the sort accorded great deference on appeal....
>
> Deference to trial court findings on the issue of discriminatory intent makes particular sense in this context because, as we noted in *Batson*, the finding will 'largely turn on evaluation of credibility.'

191 W.Va. at 596, 447 S.E.2d at 288 (quoting *Hernandez*, 500 U.S. at 364, 111 S.Ct. at 1869).

If the circuit court determines that the reason given by the State was pretextual, then a new trial should be awarded. If the trial court determines that the explanation constitutes a credible, nonracial reason for the strike, then the conviction shall stand, and the defendant may appeal that determination.

Remanded with Directions.

RECHT, Judge, sitting by temporary assignment.

CLECKLEY, Justice, concurring:
(Filed Dec. 23, 1996)

I completely agree with the majority's analysis and join the opinion. I am nevertheless *dubitante* not because of any concern as to its reasoning or its reading of *Batson* and its progeny but, rather, because I simply cannot understand why lower courts in West Virginia appear so confounded in their treatment and application of the basic analytical framework of *Batson*. In this departing concurring opinion, I will attempt to explain its ease of application. I start by reiterating the "great deference" standard that obtains when appellate courts review a *Batson* determination of the trial court. *See Purkett v. Elem*, 514 U.S. 765, 115 S.Ct. 1769, 131 L.Ed.2d 834 (1995) (per curiam). Then, before moving to specifics, I discuss in general terms the duties and obligations of the lawyers and lower court to make and defend against a *Batson* objection.

The Equal Protection provisions of the Fourteenth Amendment to the United States Constitution and Article 3, § 10 of the West Virginia Constitution proscribe racial and gender discrimination in the selection of juries:

> "Equal opportunity to participate in the fair administration of justice is fundamental to our democratic system. It not only furthers the goals of the jury system. It reaffirms the promise of equality under the law—that all citizens, regardless of race,

**11.** According to *Purkett*, *Batson* requires only a facially valid reason, not a persuasive one. 514

U.S. at 768, 115 S.Ct. at 1770–71, 131 L.Ed.2d at 839.

ethnicity, or gender, have the chance to take part directly in our democracy.... When persons are excluded from participation in our democratic processes solely because of race or gender, this promise of equality dims, and the integrity of our judicial system is jeopardized." *J.E.B. v. Alabama ex rel. T.B.*, 511 U.S. 127, 145–46, 114 S.Ct. 1419, 1430, 128 L.Ed.2d 89, 107 (footnote and citation omitted).

Not only does this proscription apply to prosecutors but it applies to defense counsel as well:

"'[B]e it at the hands of the State or the defense,' if a court allows jurors to be excluded because of group bias, '[it] is a willing participant in a scheme that could only undermine the very foundation of our system of justice—our citizens' confidence in it.' Just as public confidence in criminal cases is undermined by a conviction in a trial where racial discrimination has occurred in jury selection, so is public confidence undermined where a defendant assisted by racially discriminatory peremptory strikes obtains an acquittal." *Georgia v. McCollum*, 505 U.S. 42, 49, 112 S.Ct. 2348, 2354, 120 L.Ed.2d 33, 45 (1992) (citation omitted).

In its recent per curiam opinion in *Purkett*, the United States Supreme Court refined the procedural steps in the trial litigation. After the prosecutor struck two African–American panelists, the defendant made a *Batson* challenge. The prosecutor explained the challenge by suggesting that two prospective jurors had long unkempt hair and a beard. The prosecutor concluded by saying, "I don't like the way they looked, with the way the hair is cut, both of them. And the mustaches and the beards look suspicious to me." 514

U.S. at 766, 115 S.Ct. at 1770, 131 L.Ed.2d at 838. Further, one of the two panelists had once been the victim of a robbery with a sawed-off shotgun, and the prosecutor expressed concern that he would therefore regard the unarmed robbery being tried as a robbery. The trial court overruled the *Batson* objection. On federal habeas following the conviction, the Eighth Circuit found the trial court had not complied with *Batson* because the prosecutor's statement did not explain how the objectionable features would affect each person's ability to perform duties as a juror in the case.

The Supreme Court reversed. In *Purkett* the Court indicated that *Batson* claims require a three step procedure in the trial court: (1) a prima facie case of discrimination by the claimant, (2) a neutral explanation for the strike in question by the party exercising the challenged strike, and (3) a showing of purposeful discrimination by the claimant. According to the Court, the court of appeals erroneously combined steps (2) and (3). Step (2) merely requires that the explanation be nondiscriminatory. The Court stated that it does not require that the explanation must relate to trial strategy. Once a nondiscriminatory explanation is provided, then the burden shifts to the *Batson* claimant to show purposeful discrimination. So long as the step (2) explanation is race neutral, it does not matter that it is "silly or superstitious." Such an explanation may fail, but only at step (3) and only as part of the conclusion that the claimant has shown purposeful discrimination.[1]

Although I totally agree with the dissenting opinion by Justice Stevens in *Purkett*,[2] I can accept for purposes of West Virginia jurisprudence the analysis of the majority in

---

1. It is not until step (3) that the persuasiveness of the justification becomes relevant. At that stage, implausible or fantastic justification may (and probably will) be found to be pretexts for purposeful discrimination.

2. Justice Stevens dissented as follows:

"In my opinion, preoccupation with the niceties of a three-step analysis should not foreclose meaningful judicial review of prosecutorial explanations that are entirely unrelated to the case to be tried. I would adhere to the *Batson* rule that such an explanation does not satisfy step two. Alternatively, I would hold

that in the absence of an explicit trial court finding on the issue, a reviewing court may hold that such an explanation is pretextual as a matter of law. The Court's unnecessary tolerance of silly, fantastic, and implausible explanations, together with its assumption that there is a difference of constitutional magnitude between a statement that 'I had a hunch about this juror based on his appearance,' and 'I challenged this juror because he had a mustache,' demeans the importance of the values vindicated by our decision in *Batson.*" *Purkett*, 514 U.S. at 778, 115 S.Ct. at 1775–76, 131 L.Ed.2d at 845.

*Purkett* because in the final·analysis the result will always be the same. To be clear, I do not believe that *Purkett*'s acceptance of a facially neutral explanation, even if implausible or fantastic, sounds the death knell for *Batson* in all but the most flagrant cases. Under *Purkett,* substantial discretion is given to the trial court to find purposeful discrimination based solely on the pretextual nature of the strike. *See Barefoot v. Sundale Nursing Home,* 193 W.Va. 475, 457 S.E.2d 152 (1995); *Skaggs v. Elk Run Coal Company, Inc.,* 198 W.Va. 51, 479 S.E.2d 561 (1996).

While I am mindful that this case is being remanded so that the prosecutor may have an opportunity to explain why it did not strike a similarly situated juror, I feel compelled to make a comment on the facts of this matter based upon the record before this Court. Although the majority opinion captures the structure of the problem posed by the prosecutor's peremptory strike in this case, I do not believe the opinion wrestles with the essence of this problem. In the final analysis, this case demands that we examine the meaning of the state and federal constitutional phrase "jury of one's peers." In doing so, I intend to show that the trial court would not have abused its discretion in finding "purposeful discrimination based solely on the pretextual nature of the strike" in this case.

Let me begin with the basics. This was a drug prosecution case. At least two venirepersons, one white and the other black, had what appears to be qualitative and therapeutic prior experiences with this subject and people involved with the use of illegal drugs. The record does not disclose that either venireperson indicated that their prior work in this area would prejudice their ability to fairly and impartially hear the issues of this case and decide them on the merits. With that being so, it seems to me that both venirepersons embodied the essence, on one level, of what is meant by "jury of one's peers." That is, neither venireperson was an "armchair quarterback" with absolutely no background or experience with people involved with illegal drugs. In other words, before we even reach the issue of whether or not Mr. Foxworth was struck because of his

race, which is a constitutional level of a denial of a jury of one's peers, there exists a fundamental nonracially grounded denial of the defendant's right to a jury of his peers based upon the experience and background Mr. Foxworth brought to·the jury panel. Of course, I am not oblivious to the fact that the law has yet to reach the stage of requiring carpenters to sit as jurors for defendants who are carpenters, or physicians to sit as jurors for defendants who are doctors. However, when a juror has an articulated nonprejudicial experience or background that is central to charges against a defendant, I believe the full meaning of "jury of one's peers" is manifested. In fact, I would not be surprised if the prosecutor understood this point and grounded its decision not to strike Ms. Bator because of it. That is, Ms. Bator's prior, nonprejudicial experience made her a "peer" of the defendant in the true sense of the term. She was not some alien brought back from the latest Mars expedition and plopped down in the jury box and told to hear and decide issues she could not conceptualize or articulate.

While it seems the prosecutor appreciated and understood the value of Ms. Bator's prior experience and made certain not to remove her, not so was the case with Mr. Foxworth. Instead, the prosecutor reached into the air and lamented about some preposterous and groundless "onesided experience" Mr. Foxworth had. Where came such nonsense? The record nowhere discloses that Mr. Foxworth indicated his prior experience with a particular aspect of the drug world was such that he could not fairly and impartially hear the evidence in this case. Because of the fact that Mr. Foxworth shared a similar prior experience or background with Ms. Bator, it was unequivocally necessary for the record to have indicated Mr. Foxworth stated his prior experience would not allow him to fairly and impartially hear and decide the evidence in this case, or some other equivalent hard evidence. This being so, I believe the trial court could have very easily determined, without ever asking the prosecutor to explain why it did not strike the similarly situated Ms. Bator or shifting the burden to the defendant to show purposeful discrimination, that the prosecutor's prof-

fered reason for striking Mr. Foxworth was pretextual. Race aside, Mr. Foxworth's prior experience made him the essence of a juror peer for the defendant in this case, to the exact degree of that of Ms. Bator. What was the wildcard in this case? Mr. Foxworth's clothing? his race? his cologne? the length of his fingernails? Remanding this case to have the prosecutor explain why it did not strike Ms. Bator, while necessary, will not answer the wild card question in this particular case. This is because, all things considered, the prosecutor will proffer some explanation that satisfies not striking Ms. Bator. However, if we remove Ms. Bator from the formula and simply remain focused on the nonracial peer experience Mr. Foxworth brought to this case, we can very easily dispense with the proffered "onesided experience" pretext and reasonably conclude that Mr. Foxworth's race was the only reason he was not allowed to bring that valuable experience to this prosecution.

To suggest that the evidence appears to tilt toward a finding of impermissible peremptory race striking, does not end the drama in this case, if upon further review by the trial court this proves to be true. Central to this issue, and the larger national legal arena in which it is played out, is a fundamental matter that too often is never articulated. What does it mean to strike a juror because of race? Embroiled in this question is a walking conclusive presumption that too many prosecutors have that African–Americans want drug dealers, murderers, thieves, rapists—criminals—to remain free in their midst. African–Americans want and demand nothing more or less than justice. They do not walk the streets of our cities and the halls of our government with some innate desire to become a victim of murder, theft, rape—a victim of any crime. African–Americans want safe homes, neighborhoods, towns, cities, states—like all other Americans, they want an America that is free of crime. They do not wear a badge that says "We will not convict another African–American." They wear the same badge that most other Americans wear that says, "We will convict the guilty upon proper proof and free the innocent when such proof is wanting." Is this not the essence of our legal system? Somewhere down the road our legal system must rid itself of the unspoken lie that African–Americans want to be victims of crime and therefore will not convict criminals. While no lie may live forever, this one has lived too long. With these words of "wisdom," I pass the torch.